## CORONADO COAL COMPANY ET AL. *v.* UNITED MINE WORKERS OF AMERICA ET AL.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 671. Argued January 7, 1925.—Decided May 25, 1925.

1. Where the constitution of an "international" trade union provided that its constituent district organizations might order local strikes within their respective districts on their own responsibility, but that such strikes, to be financed by the international union, must be sanctioned by its executive board, *held* that liability for damages to property inflicted in a local strike called without such sanction by a district organization could not be imposed on the larger organization, and that evidence of participation by its president was insufficient to show participation by the organization itself or to bind it on principles of agency. P. 299.

2. The mere reduction in the supply of an article to be shipped in interstate commerce by the tortious prevention of its production is ordinarily an indirect and remote obstruction to that commerce; but when the intent of those unlawfully preventing the production is to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act. P. 310.

3. In an action brought under the Anti-Trust Act by the owners of coal mines against a district union and local unions of coal miners and individuals, to recover damages resulting from the destruction of the mines during a strike, *held* that there was substantial evidence tending to prove that the purpose of such destruction on the part of the defendants was to stop the production of non-union coal and prevent its shipment to markets in other States where it would by competition tend to reduce the price of the commodity and thus affect injuriously the maintenance of wages for union labor in competing mines, and that direction of a verdict for the defendants was therefore erroneous. P. 305.

4. In such a case, evidence tending to prove that the production of the plaintiffs' mines with non-union labor would be sufficient to become a serious factor in the interstate coal market, is relevant, in connection with other evidence of the intent of the defendants to prevent its shipment to neighboring States at non-union cost. P. 305.

300 Fed. 972, in part affirmed; in part reversed.

ERROR to a judgment of the Circuit Court of Appeals which affirmed a judgment of the District Court entered on a verdict directed for the defendants, in an action for treble damages under the Anti-Trust Act. For the opinion of this Court on a former review, see 259 U. S. 344.

*Mr. Henry S. Drinker, Jr.*, with whom *Messrs. James B. McDonough* and *Edwin A. Lucas* were on the briefs, for plaintiffs in error.

*Mr. William A. Glasgow, Jr.*, with whom *Messrs. G. L. Grant* and *Henry Warrum* were on the brief, for defendants in error.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a suit for damages for the effect of an alleged conspiracy of the defendants unlawfully to restrain and prevent plaintiffs' interstate trade in coal in violation of the first and second sections of the Federal Anti-Trust Act. The charge is that the defendants, in 1914, for the purpose of consummating the conspiracy, destroyed valuable mining properties of the plaintiffs. Treble damages and an attorney's fee are asked under the seventh section of the Act. The suit was brought in the District Court for the Western District of Arkansas. The plaintiffs are the Bache-Denman Coal Company and eight other corporations, in each of which the first named owns a controlling amount of stock. One of them is the Coronado Company, which gives the case its name. The corporations were correlated in organization and in the physical location of their mines. They had been operated for some years as a unit in the Prairie Creek Valley in Sebastian County, Arkansas. Immediately after the destruction of the property the District Court in a proper proceeding appointed receivers for the mines, and they or their successors are also parties to this suit. The original com-

plaint was filed in September, 1914. It was demurred to, and the demurrer sustained. On error in the Court of Appeals the ruling was reversed. *Dowd* v. *United Mine Workers of America,* 235 Fed. 1. The case then came on for trial on the third amended complaint and the answers of the defendants. The trial resulted in a verdict of $200,000 for the plaintiffs, which was trebled by the court, and a counsel fee of $25,000 and interest to the date of the judgment were added. The Court of Appeals reversed the judgment as to interest, but in other respects affirmed it. 258 Fed. 829. On error from this Court under § 241 of the Judicial Code, the judgments of both courts were reversed, and the cause remanded to the District Court for further proceedings. The opinion is reported in 259th United States, 344. The new trial, in October, 1923, resulted in a directed verdict and judgment for the defendants, which was affirmed by the Circuit Court of Appeals. The case is here on error for a second time.

In our previous opinion we held that the International Union, known as the United Mine Workers of America, the union known as United Mine Workers, District No. 21, and the subordinate local unions which were made defendants, were, though unincorporated associations, subject to suit under the Anti-Trust Act, but that there was not sufficient evidence to go to the jury to show participation by the International Union in the conspiracy and the wrongs done. We found evidence tending to show that District No. 21 and other defendants were engaged in the conspiracy and the destruction of the property, but not enough to show an intentional restraint of interstate trade and a violation of the Anti-Trust Act. The plaintiffs contend that they have now supplied the links lacking at the first trial against each of the principal defendants.

The Bache-Denman mines lie near the west line of Arkansas, next to Oklahoma. In all the Arkansas mines,

except a small one, union miners were engaged. The towns of the neighborhood—Hartford, Huntington, Midland, Frogtown and others—were peopled by them. District No. 21 was a regional organization of the United Mine Workers which included Arkansas, Texas and Oklahoma. Mr. Bache as manager of the plaintiffs' mines had been operating them for a number of years with union labor and under a District No. 21 contract and scale of wages, which did not expire until July 1, 1914. In March of that year he determined to run his mines thereafter on a non-union or open basis, and notified Pete Stewart, the president of the District No. 21, that he intended to do so. He shut down his mines and prepared to open them on an open shop basis on April 6th. He anticipated trouble. He employed three guards from the Burns Detective Agency and a number of others to aid him. He bought a number of Winchester rifles and ammunition, and surrounded his principal mining plant at Prairie Creek, No. 4, with cables strung on posts. He had notices prepared and sent to his employees who occupied the company's houses that they should vacate unless they remained in his employ. He sent out for non-union men and had gathered some thirty or more for the day fixed for the opening. The people in all that part of the country were urged by the members of the local unions to come to a meeting at the school house, a short distance from the Prairie Creek mine, for a public protest. The meeting appointed a committee to visit the superintendent and insist that the mine remain a union mine. The guards, directed not to use their guns save to defend their own lives, were at the mercy of the union miners, who assaulted them, took their guns away and injured a number of them. The employees deserted the mine, which filled with water upon the stopping of the pumps. One of the crowd went up to the top of the coal tipple and planted a flag on which was the legend, "This is a union man's country."

Mr. Bache obtained from the federal District Court an injunction against the union miners and others taking part in this lawless violence, including among them the President of No. 21, Pete Stewart, and Holt, its Secretary-Treasurer. Bache then prepared to resume mining. The work progressed under the protection of United States deputy marshals. Meanwhile non-union miners and other employees were brought in from out of the State. The United States marshals were after some weeks withdrawn from the property and only private guards were retained. Meanwhile the water had been pumped out and the mining and shipping of coal were about to begin. A large force of union miners of the local unions and of District No. 21, and their sympathizers, armed themselves with rifles and other guns furnished and paid for by the District No. 21 organization, and before day on July 17th began an attack upon the men whom Bache had brought together, and proceeded to destroy the property and equipment. It was a battle, in which two of the employees of the mine, after capture, were deliberately murdered, and not only gunfire and bullets but also dynamite and the torch were used to destroy all the property on the premises of the Prairie Creek Mine and of three of the other mines of the plaintiffs.

First. Is there any evidence in the present record tending to show that the International Union of the United Mine Workers participated?

Under Article 16 of the constitution of the International Union, it is provided, Section 1:

"No district shall be permitted to engage in a strike involving all or a major portion of its members, without the sanction of an International Convention or the International Executive Board."

Section 2:

"Districts may order local strikes within their respective districts on their own responsibility, but where local

strikes are to be financed by the International Union, they must be sanctioned by the International Executive Board."

It does not appear that the International Convention or Executive Board ever authorized this strike or took any part in the preparation for it or in its maintenance, or that they ratified it by paying any of the expenses. It came within the definition of a local strike in the constitutions of both the national and district organizations. The district organization made the preparations and paid the bills. It was sought on both trials to bring the International in by proving that the President of the national body, John P. White, was in Kansas City and heard of the trouble which had taken place on April 6 at Prairie Creek, and that he reported it to the International Board; and further that in May he made a long speech at a special convention of District No. 21, held at Fort Smith, Arkansas, for the trial of one of its officers for corruption, in which he referred with earnest approval to the great international union strikes in Colorado and West Virginia, but made no specific allusion to the Prairie Creek difficulty. It was also argued that communications from outsiders and editorials published in the United Mine Workers' journal giving an account of the occurrence at Prairie Creek, and representing that the troubles were due to the aggression of the armed guards, and that the action of the union men was justified in defense of their homes, expressed such sympathy with the union men as to constitute a ratification by the International Union because the United Mine Workers' journal was an authorized publication of the Union.

There were introduced at both trials long accounts of speeches and votes at national conventions of the International Union and meetings between union operators and representatives of the International Union from 1898 to 1914, revealing a constant effort on the part of the

operators to force wages down to meet the competition of non-union mines, accompanied by assurances by the union representatives that they would do everything to unionize the competing non-union mines and enable the union mine operators to maintain the scale insisted on.

We thought at the first hearing and we think now that none of this evidence tends to establish the participation of the International in the Prairie Creek strike and disturbances.

The new evidence adduced for the purpose is chiefly the testimony of one James K. McNamara. He was the secretary of Local Union No. 1526 at Hartford and check-weighman at Mine No. 4 of the Central Coal & Coke Company, a union mine which was a competitor of the Bache-Denman mines and of larger capacity and business. McNamara seems to have been the field leader of the union forces at the battle of July 17, 1914. He was tried with others and convicted for violation of the injunction as a conspiracy to defeat the process of the federal court, and was confined in the Leavenworth penitentiary. His testimony at the second trial was that in May, 1914, between the riot of April and the July battle, he went to Fort Smith to see Pete Stewart, the President of District No. 21, who was ill; that Stewart told him that he had been to Kansas City and had a talk with White, the International President, and that they had arranged a plan there to prevent Bache from producing coal. He said that White wished to see McNamara. Thereafter White came to Fort Smith to participate in the trial of the secretary of No. 21, already mentioned, between the 18th and 23rd of May. McNamara said he went to Fort Smith and met one Jim Slankard, who was a town marshal in Hartford, Sebastian County, and a very active promoter of union violence in this case, that Slankard told him that White wished to see him at the hotel, that he and Slankard went to White's room, that

White said, "How is things at Prairie Creek?" that the witness said, "Things are a little watery in Prairie Creek No. 4, yet," referring to the pumping of the water out of the mine which was going on, to which White replied: "Yes, I have been informed on that"; and then said, "Stewart told me that they can not get enough men to operate the mine." And continued, "If they do that, we must prevent the coal from getting into the market."

Q. Did he say why? A. Yes sir.

Q. Tell it. A. He said, "because if Bache coal, scab dug coal got into the market it would only be a matter of time until every union operator in that country would have to close down his mine, or scab it, because the union operators could not meet Bache competition."

Q. Did he say anything more after that? A. Yes sir.

Q. What did he say? A. He said, "When you go back to Hartford," he said, "I want you to tell the men what I have told you, but don't tell them I have told you."

Q. Did he say why not? A. Yes sir, he said he did not want the National Organization mixed up in this case; he said, "So far you have handled it, this part, and we have West Virginia and Colorado on our hands, and we can not bear any more fights."

Q. After that, did you go up and down the valley, as he said? A. I went back to Hartford and just quietly told the men what he said.

Q. How many of them did you tell, in a general way? A. I don't remember, I told practically everybody, I suppose.

Q. What did you tell them? A. I told them what White told me.

Q. Tell them the reasons, as he had given them to you? A. Yes sir.

Q. And in pursuance of that, was that doctrine told all over the valley? A. Yes sir. I told the men we wouldn't do anything until Bache begun producing coal.

Q. Now did you know what Pete Stewart did on Monday following that convention about going around the field?   A. He came to Hartford and made a speech.   He said he would furnish guns and ammunition to all these men and their families in that valley, and if it was necessary he would sacrifice his own life to prevent Bache getting coal out there.

McNamara further testified that he saw between three and four hundred guns in boxes at Hartford and that part of them were distributed to the union miners and part returned to the secretary of District No. 21 at McAlester, Oklahoma.   It was an avowed grievance of McNamara that he had not been paid sufficient money for the sacrifices he had made to the union cause.   He said he had received $250 after the battle of July 17 from Stewart of District No. 21 to enable him to escape and avoid arrest, and something more later, but nothing from White or the International.   He volunteered in his cross-examination the statement that White said to him at the interview: "Now you boys will not lose a day and your expenses will be paid for every day you are in this trouble."   He was led by other questions to add that the trouble referred to by White was his suffering in the penitentiary.   When it was called to his attention that his conversation with White in May, 1914, was before he had gone to the penitentiary, he found it necessary to qualify his statement and in answer to the question: "Did you have any arrangements to get money from him then?" said: "It was generally understood that the National Organization was going to pay us for the time we lost   .   .   , and I thought the only man to go to would be White to get it, because he was the National President."   And so, he said, two years after he had finished his term at the penitentiary, he met White at Hartford and asked him "When will I get my money that I was promised for this work?"

to which White replied: " I will take it up with the Board as soon as I can." But he said he never got any money. We do not regard this as evidence that he was promised or received money from the International either to induce or reward his unlawful acts.

Giving the fullest credence to all that McNamara says, it is clear that White did not intend by what he did to make the Prairie Creek difficulty a national affair. The International Board had not approved as the constitution required that they should do in order to make it so. It is quite true that White himself personally can be held as a defendant, if McNamara's evidence is to be believed, for urging and abetting the destruction of the plaintiffs' property; but according to McNamara's testimony, repeated by him several times, White was particular to insist that he did not wish to be regarded as acting for the International in the matter or to involve it in the Prairie Creek difficulties. In our previous opinion we held that a trades-union, organized as effectively as this United Mine Workers' organization was, might be held liable, and all its funds raised for the purpose of strikes might be levied upon to pay damages suffered through illegal methods in carrying them on; but certainly it must be clearly shown in order to impose such a liability on an association of 450,000 men that what was done was done by their agents in accordance with their fundamental agreement of association.

As we said in our previous opinion, 259 U. S. 395:

"A corporation is responsible for the wrongs committed by its agents in the course of its business, and this principle is enforced against the contention that torts are *ultra vires* of the corporation. But it must be shown that it is in the business of the corporation. Surely no stricter rule can be enforced against an unincorporated organization like this. Here it is not a question of contract or of holding out an appearance of authority on which some

third person acts. It is a mere question of actual agency which the constitutions of the two bodies settle conclusively."

Again:

" But it is said that the District was doing the work of the International and carrying out its policies and this circumstance makes the former an agent. We can not agree to this in the face of the specific stipulation between them that in such case unless the International expressly assumed responsibility, the District must meet it alone."

The action of the trial court in its direction of a verdict for the defendant, the International Union, must be affirmed.

Second. The tendency of the evidence to show that District No. 21 through its authorized leaders and agents and certain of its subordinate local unions organized and carried through the two attacks of April 6th and July 17th is so clear that it does not need further discussion. The only issue is whether the outrages, destruction and crimes committed were intentionally directed toward a restraint of interstate commerce. On the first trial we held that the evidence did not show this. The circumstances seemed amply to supply a different and a merely local motive for the conspiracy. The hostility of the head of District No. 21 and that of his men seemed sufficiently aroused by the coming of non-union men into that local community, by Mr. Bache's alleged breach of his contract with District No. 21 in employing non-union men three months before it expired, by his charged evasion of it through a manipulation of his numerous corporations, by his advertised anticipation of trespass and violence in his warning notices, in his enclosing his mining premises with a cable, and in stationing guards with guns to defend them. These preparations in the heart of a territory that had been completely unionized for years were likely to stir a bitterness of spirit in the neighborhood. Bache

55627°—25——20

had himself foreseen such a spirit when he took part in the formulation of a letter to his stockholders for his superintendent to sign, in which it was said: "To do this means a bitter fight, but in my opinion it can be accomplished by proper organization." He testified that he was entering into a matter he knew was perilous and dangerous to his companies. In view of these circumstances, we said in the previous opinion:

"Nothing of this is recited to justify in the slightest the lawlessness and outrages committed, but only to point out that as it was a local strike within the meaning of the International and District constitutions, so it was in fact a local strike, local in its origin and motive, local in its waging, and local in its felonious and murderous ending."

Were we concerned only with the riot of April 6th, we should reach the same conclusion now; but at the second trial plaintiffs were able to present a large amount of new evidence as to the attitude and purpose of the leaders and members of District No. 21, shown especially in the interval between the riot of April 6th and the destruction of the mine property on July 17th following. This is attributed by counsel for the plaintiffs to the fact that the new witnesses had moved away from Sebastian County, Arkansas, and were freed from local restraint and to grievances of former union sympathizers and participants who thought themselves not sufficiently appreciated.

Part of the new evidence was an extract from the convention proceedings of District No. 21 at Fort Smith, Arkansas, in February, 1914, in which the delegates discussed the difficulties presented in their maintenance of the union scale in Arkansas, Oklahoma and Texas because of the keen competition from the non-union fields of Southern Colorado and the non-union fields of the South in Alabama and Tennessee. Stewart, the president,

called attention to a new field in Oklahoma which he said would be a great competitor of union coal fields, and that District No. 21 would be forced to call a strike to bring into line certain operators in that section, and in the event that they did so the District would fight such a conflict to the bitter end regardless of cost. They also discussed a proposal to reduce the scale at the union mines at McCurtain, Oklahoma, which Stewart advocated, in order that the McCurtain operators might be put on a proper competitive basis in interstate markets with other operators. Several of the delegates at this convention took part in the riot of April 6th and the battle of July 17th following.

A new witness was one Hanraty, who was for seven years president of District No. 21, then a state mine inspector for three years, and then national organizer from 1912 to 1914, and president of District No. 21 again in 1915, but subsequently separated from the union. He testified that he had been closely associated as president of the District with Stewart as a member of the District executive board. He had been frequently in close conference with most of the leading men who had taken part in the violence at Prairie Creek. He said that he made speeches all through District No. 21 and did not remember a speech in which he did not mention the danger from non-union coal in taking the markets of union coal and forcing a non-union scale, and that it was a constant subject of discussion among the officers and members.

A leading witness among many others on this subject was a Dr. H. P. Routh, who practiced medicine at Hartford in 1914, and who lives now at Tulsa, Oklahoma. He said he was living at the Davis Hotel in Hartford in May, 1914, when the Executive Board of District No. 21 came down there for a meeting, and he heard a great deal of the conversation between the board members as to the

effect of this threatened non-union Bache-Denman opera-. tion. The conclusion they reached was that its success would affect so injuriously the trade of the Central Coal & Coke Company in shipping and selling coal in the neighboring States, that this company, the largest coal producer in that section, would have to become non-union. He talked specifically to several members of the Board and of the Union who, the evidence shows, were shown to be actively engaged in the battle of July 17th.

In addition to this, the testimony of McNamara, already discussed, while ineffective to establish the complicity of the International Union with this conspiracy, contains much, if credited, from which the jury could reasonably infer that the purpose of the union miners in District No. 21 and the local unions engaged in the plan was to destroy the power of the owners and lessees of the Bache-Denman mines to send their output into interstate commerce to compete with that of union mines in Oklahoma, in Kansas, in Louisiana markets and elsewhere. It appeared that 80 per cent. of all the product of the mines in Sebastian County went into other States.

New and more elaborate evidence was also introduced in the second trial as to the capacity of the Bache-Denman mines under the open shop. In our previous opinion we declined to hold that the mere elimination from interstate trade of 5,000 tons a week, which we took to be the practical limit of capacity of the plaintiffs, was significant in the total tonnage of the country or state or that its stoppage furnished a basis of itself for inferring a palpable and intentional restraint of interstate trade with which the defendants could be charged even though coal could be produced at a reduced cost under non-union conditions. The amount we assumed was based on the averments of the third amended bill in which the normal gross income from the four mines of the plaintiffs used by them, and which were destroyed, was alleged to be in good times be-

fore the trouble something more than $465,000 a year. At the price at which coal usually sold at the mine, this would make the output 5,000 tons a week. In a petition for a rehearing, plaintiffs urged upon us that this was an error and that the potential capacity of all the mines owned and leased by the Bache-Denman Company in that region, nine in number, was 5,000 tons a day rather than 5,000 tons a week. In the view we took of the evidence then before us, we had only the isolated circumstance of the reduction in shipment of the normal product of the four mines destroyed, without other evidence to show an actual intent and plan on the part of the defendants thereby to restrain interstate commerce. Whatever error therefore might have been made in stating the capacity of all the mines of the plaintiffs could not affect our conclusion, and the rehearing was denied. In the second trial, however, the total possible capacity not only of the destroyed mines but of the other unworked mines of plaintiffs became more important, in view of the direct testimony as to the moving purpose of District No. 21 to restrain and prevent plaintiffs' competition. The possible total to which their production might be brought was testified to by a number of new expert witnesess who were familiar with the mines and the business of mining and selling coal in the markets of the neighboring States. The conclusion of some of these witnesses was that with the union restrictions removed and a regular demand for the coal, the capacity of all the mines, owned and leased by the plaintiffs, those destroyed and those uninjured, could have been increased to substantially more than 5,000 tons a day. Such conclusion was possibly subject to criticism as exaggerated and speculative, and dependent on conditions probably not realizable, but it was all relevant evidence for the jury to consider and weigh as a circumstance with the rest of the new testimony in proof of intent of the leaders of District No. 21 to prevent shipments to neighboring States

of such an amount of non-union coal at non-union cost. There was also new evidence tending to show the knowledge by Hanraty, Stewart and other leaders of District No. 21 of the character of plaintiffs' mines and their capacity.

The mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce. But when the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act. *United Mine Workers* v. *Coronado Co.*, 259 U. S. 344, 408, 409; *United Leather Workers* v. *Herkert*, 265 U. S. 457, 471; *Industrial Association* v. *United States*, *ante*, p. 64. We think there was substantial evidence at the second trial in this case tending to show that the purpose of the destruction of the mines was to stop the production of non-union coal and prevent its shipment to markets of other States than Arkansas, where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines, and that the direction by the District Judge to return a verdict for the defendants other than the International Union was erroneous.

We affirm the judgment of the District Court and the Circuit Court of Appeals in favor of the International Union of United Mine Workers of America, and reverse that in favor of District No. 21 and the other local unions and the individual defendants and remand the cause as to them for a new trial.

*Affirmed in part and reversed in part.*