## APEX HOSIERY CO. v. LEADER et al.
### No. 9741.

District Court, E. D. Pennsylvania.
June 5, 1937.

Harry G. Sundheim, Arno P. Mowitz, and Sylvan H. Hirsch, all of Philadelphia, Pa., for plaintiff.

Nathan Ziserman, Benjamin R. Simons, Isadore Katz, and M. Herbert Syme, all of Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.

The plaintiff is a manufacturer of full-fashioned hosiery. It has a good sized plant in the city of Philadelphia and employs 2,500 people. Its operations include the purchase of raw material from other states, manufacture of hosiery at its mill here, and shipment of the manufactured product into other states. It had on hand May 6, 1937, about $600,000 worth of finished stockings which were intended to be shipped in interstate commerce.

On May 6, 1937, a mob of some 10,000 people gathered outside of the plaintiff's plant and after an announcement by the defendant Leader, president of the union, that a sit-down strike was declared, broke into the building, did a considerable amount of physical damage to the furniture, office equipment, and windows, and assaulted and injured a few unarmed and defenseless employees who were found on the premises.

It has not been proved that any of the defendants took part directly in any of these acts of violence, but it is a fact that Leader and a number of the members of the union entered with the mob, that cots and other equipment for a sit-down strike were brought in at about the time that the mob entered, that after the mob had finally drifted out members of the union remained in the plant, that they proceeded to occupy it from May 6th until the present time and are still there, that they have excluded the plaintiff, its agents and employees from entering the plant except as permitted by the defendants for their own purposes, and that the result of the sit-down strike is a complete stoppage of production and a complete paralysis of all of the plaintiff's business operations.

A number of police officers were present at the time of the mob violence referred to, but made no effort to interfere with it in any way. They may have refrained from taking any actions by reason of instructions from superior officers, or it may have been that, in view of the size and temper of the mob, they felt that such action would have been futile, and dangerous to themselves. The plaintiff has appealed since that time to the officers charged with maintaining order and has received no response from them.

The plaintiff then filed this bill in equity in the United States court. The essential prayer of the bill is that the defendants be ordered and directed to surrender up possession of the seized premises, machinery, and equipment.

█ The continued occupation of the plant and holding of the premises against the plaintiff is a continuing trespass and a flagrant violation of the law of the state of Pennsylvania.

█ But the federal court is without jurisdiction to entertain this bill. There is no diversity of citizenship. It has not been seriously argued that the Wagner-Connery Labor Relations Act (National Labor Relations Act), 29 U.S.C.A. § 151 et seq., confers jurisdiction upon this court, and the only basis upon which the plaintiff contends that the federal court has jurisdiction is its power to restrain violations of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note.

The Sherman Anti-Trust Act declares illegal every combination in restraint of trade or commerce among the several states. It has been held that it applies to labor combinations as well as combinations of capital or of employers.

In construing the Sherman Act, however, the Supreme Court has consistently held to the view that as applied to labor combinations, in order to constitute a violation of the act, there must appear something more than "the mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production." (I am quoting from the Second Coronado Case.) Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S. Ct. 551, 556, 69 L.Ed. 963.

There must be present the purpose or intent to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets (Second Coronado Case) or to monopolize the supply, control the price, or discriminate as between would-be purchasers (United Leather Workers' Union v. Herkert & M. Trunk Co., 265 U.S. 457, 471, 44 S.Ct. 623, 627, 68 L.Ed. 1104, 33 A.L.R. 566) or to accomplish an undue and unreasonable restraint of commerce in the article, as it has sometimes been put (Bedford Co. v. Stone Cutters' Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791).

Now, there may be direct evidence of this intent; that is to say, there have been cases in which it has been found from the declarations of the defendants, from the publications of their official organs, from the minutes of the meetings of the unions that the primary object and purpose of the strike was to prevent competition in interstate commerce of goods produced in one locality with goods produced in a distant locality. Such evidence was found in the Second Coronado Case and in the Alco-Zander Case [Alco-Zander Co. v. Amalgamated Clothing Workers (D.C.) 35 F.(2d) 203], which was decided by this court some years ago.

In this case there is no such evidence. All the direct evidence as to the purpose of the defendants in seizing and occupying the mill goes to show that it was solely to compel the plaintiff, by means of an indefinite suspension of manufacture and consequent financial loss, to accept the closed shop. There is no evidence of any other purpose.

The intent may also be presumed. I should say that it may be presumed in two kinds of cases.

First, I think there might be a presumed intention—although this is not necessary to decide in connection with this case, but I merely point it out—where the interference with production is so widespread as to result in stopping completely the entire manufacture and transportation in commerce of the product of some entire industry.

Obviously, that situation does not exist in the present case. There is no evidence before me as to the extent of the hosiery industry, but it is apparent that the effect of the elimination from commerce of the production of this individual mill cannot be very great, assuming that it produces 2 or 3 per cent., or even a little more, of the total production of the country.

Second, if the interference with commerce is direct and immediate, that is to say, to give the illustration that was used in the argument, if the track of a railway company were torn up or blocked, or the actual transportation of goods across the state line is interfered with, you would have an illustration of a direct and immediate interference. I do not mean to say that that is the limit of what constitutes such an interference, but it is an illustration. Here the purpose will be presumed because of the general rule which is just as true here as elsewhere that men will be presumed to have intended results which must flow necessarily, directly, and immediately from their acts. Where, however, the result is remote or merely incidental, the force of the presumption fails.

The plaintiff contends that this case presents an instance of a direct and immediate interference or restraint upon interstate commerce and that the intent must be presumed. I would have no question whatever about the fact that it does not, in view of the earlier decisions of the Supreme Court, except for the recent opinions of the Supreme Court in the Wagner Labor Act Cases (National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L. R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 57 S.Ct. 642, 81 L. Ed. 918, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352; Washington, V. & M. Coach Co. v. National Labor Relations Board, 57 S.Ct. 648, 81 L.Ed. 965; Associated Press v. National Labor Relations Board, 57 S.Ct. 650, 81 L.Ed. 953), but after examining those decisions carefully, I am still of the same opinion.

The first Coronado Case furnished an example of a more irrevocable stoppage of production than took place in the case now before the court. In the Coronado Case there was not a seizure and holding of the plant of the plaintiff, but the complete destruction of a large part of it accompanied by the murder of some of the employees and the burning of the property.

The court, however, held that in that case there was wanting both direct evidence

of intention to restrain interstate commerce, and evidence of a direct interference with the flow of the supply of the coal, from which the intent could be presumed.

The plaintiff argues, however, that as a result of the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352, what might have been formerly an indirect restraint upon commerce has become a direct restraint, because the effect of those decisions is to hold that production is commerce, and that, therefore, the stoppage of production is a direct restraint of commerce. I do not so construe the decisions.

In the first place, it is to be remembered throughout that all of the earlier opinions were not simply concerned with the definitions of interstate commerce, but had to do with the meaning of the clause of the statute "in restraint of commerce among the states," whereas, in the National Labor Board Cases, the court was dealing with the commerce clause of the Constitution and was particularly addressing itself to the power of Congress to regulate certain practices as "affecting commerce." Chief Justice Hughes said in the Jones & Laughlin Case, referring to section 10 (a) of the act (29 U.S.C.A. § 160 (a), "the critical words of this provision, prescribing the limits of the Board's authority in dealing with the labor practices, are 'affecting commerce.' "

In the second place, the entire rationale of the decision is that under the power to regulate interstate commerce, Congress may deal with various phases of business activity which are in themselves strictly intrastate, and I cannot find in the decisions any ruling to the effect that production is now commerce. Production may, under certain conditions, be regulated and dealt with under a statute which intends to deal with activities affecting interstate commerce, but even when so regulated or so affected it is still production and not, in itself, interstate commerce.

The court said in the Jones & Laughlin Case, further: "The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a 'flow' of interstate or foreign commerce. Burdens and obstructions may be due to injurious action springing from other sources. The funda-

mental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection and advancement.' * * * Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control."

There is no question that under the decision in the Friedman-Harry Marks Clothing Company Case Congress had the power to apply the Wagner Labor Act to this plant, but that was not because production in it is interstate commerce, but for the reasons I have just quoted from Justice Hughes' opinion.

The distinction between the Labor Board Cases and the cases under the Anti-Trust Law is the distinction between defining Congressional power and determining what acts will give rise to a presumption that a restraint of commerce was intended. In the Anti-Trust Law cases it has been uniformly held that those acts must have to do directly with interstate commerce itself and it was never held that acts affecting intrastate production were sufficient, even though such production might be close enough to commerce to give Congress the right to control and regulate it for some purposes. On the contrary, the express decision has always been that such acts were insufficient.

In the view which I take of the case, it is not necessary to pass upon the argument urged by the defendants that section 13 of the National Labor Relations Act (29 U.S.C.A. § 163), in effect, amends the Anti-Trust Law by curtailing still further the power of the court to issue injunctions in labor cases. That question might arise if we had here a case where there was either evidence of an express intent to restrain commerce, or such a general and wide-spread interference with the flow of commerce as to necessitate the conclusion that there was an intent to monopolize, control, and dominate the entire field of the industry.

In the case of Industrial Association of San Francisco v. United States, 268 U.S. 64, 45 S.Ct. 403, 407, 69 L.Ed. 849, the court by Justice Sutherland quoted with approval the language of the court in the United Leather Workers Case, which, in

turn, quoted the Circuit Court of Appeals (284 F. 446), saying: "The natural, logical and inevitable result will be that every strike in any industry or even in any single factory will be within the Sherman Act and subject to federal jurisdiction provided any appreciable amount of its product enters into interstate commerce." I think, in spite of the argument and the distinction drawn by the plaintiff between legal and illegal strikes, those remarks can be well applied to the situation presented to the court by this case. I do not see how the conclusion can be avoided that, if the court takes jurisdiction in this case, it will find that it has taken jurisdiction of every strike in any industry in which there is any substantial or appreciable stoppage, reduction, or curtailment of the supply of an article which is designed to pass into interstate commerce.

The motion for a preliminary injunction is denied and the bill may be dismissed.