CONSOLIDATED TERMINAL CORPORA-
TION v. DRIVERS, CHAUFFEURS
AND HELPERS LOCAL UNION
639 et al.
SINGER v. SAME.
Civ. A. Nos. 5988, 5751.

District Court of the United States for the
District of Columbia.
June 26, 1940.

646

William E. Leahy and William J. Hughes, Jr., both of Washington, D. C., for plaintiffs.

Joseph A. Padway and Herbert S. Thatcher, both of Washington, D. C., for defendants.

MORRIS, District Judge.

In each of these cases a motion to dismiss the complaint was filed by the defendants. It was agreed that the cases should be heard together on such motion.

The Consolidated Terminal Corporation is engaged in the wholesale manufacture and distribution of ice in the District of Columbia, and has an extensive trade in the District of Columbia, Maryland and Virginia. The defendant, Drivers, Chauffeurs and Helpers Union 639, is a voluntary, unincorporated association, and is a labor organization, the membership of which are drivers, chauffeurs. and helpers. Bernard Singer, the plaintiff in the other action, is the owner and operator of Singer's Lafayette Bar and Restaurant in the District of Columbia, and under an agreement with the Consolidated Terminal Corporation purchases from that company any and all ice required by such bar and restaurant at a price which he considers advantageous to himself. The defendants in the Singer action are the same as those in the Consolidated Terminal case.

The Consolidated Terminal Corporation charges the defendants, in the first cause of action, with a conspiracy to illegally restrain trade and commerce in the District of Columbia, Maryland and Virginia, and asks for damages, to be trebled, together with reasonable counsel fees and costs, pursuant to the provisions of the Federal Anti-Trust Laws, Secs. 3 and 15, Ch. 1, 15 U.S.C.A. It is alleged that the plaintiff's employees are not members of any labor organization, and that it has had no labor dispute with them, and that the defendants wrongfully conspired with each other and with other persons, to the plaintiff unknown, to compel plaintiff to force its employees against their will to join the defendant union, in default of which defendants would wreck and destroy plaintiff's business for the two-fold purpose of compelling plaintiff to coerce plaintiff's employees to join the said union, and to destroy plaintiff's business in order to increase the business of other ice manufacturing and distributing companies, which had theretofore been unionized by defendants; and that it was part of the said illegal conspiracy that defendants would illegally restrain trade and commerce in the District of Columbia, Maryland and Virginia. It is further alleged that it was part of said illegal conspiracy that the defendants would undertake to "picket" plaintiff's

premises and have a "picket line patrol" in front of loading platforms where ice was loaded at plaintiff's premises, displaying a placard containing the words: "Terminal Ice unfair to Drivers, Chauffeurs, and Helpers Local Union 639, affiliated with Teamsters Joint Council 55, Washington Central Labor Union and A. F. of L."

It is also alleged that it was a part of said conspiracy that defendants would approach plaintiff's customers and threaten the said customers that unless they ceased doing business with plaintiff, the said customers' place of business would in turn be "picketed;" that plaintiff's customers would be advised that they must do business with a union ice company, and not with plaintiff; otherwise defendants would "picket" their premises and cut off their source of supplies; that, after threatening plaintiff's customers, defendants would cut off the source of supplies of plaintiff's customers and prevent plaintiff's customers from delivering their merchandise to their own customers; that, if plaintiff's customers did not follow the defendants' instructions, defendants would undertake by picketing, boycotts, blacklisting and otherwise to destroy the business of such persons and companies; that defendants would communicate with the various customers of plaintiff and falsely represent to the said customers that plaintiff was "the only local ice manufacturer that refuses to recognize or deal with organized labor;" that defendants would communicate with plaintiff's competitors, advising them that the union would shortly make a drive on plaintiff's business in an effort to injure and destroy it, and that the said competing companies should begin a solicitation of plaintiff's customers, a list of which the defendants would furnish plaintiff's competitors. It is further alleged that the defendants had committed certain overt acts in furtherance of said conspiracy, namely, that defendants mailed a postcard to plaintiff's customers, advising them as follows:

"We are informed that you are served by the Consolidated Terminal Corporation, which is the only local ice manufacturer that refuses to recognize or deal with organized labor. We would greatly appreciate your cooperation with our efforts to secure union conditions in the said company.

"Very truly yours,
"Drivers, Chauffeurs, Helpers Local Union 639."

It is also alleged that defendant sent a representative to at least one of plaintiff's customers, requesting him to cease dealing with plaintiff, and to give his ice business to a union company; that a "picket" has appeared in front of plaintiff's premises and proceeded to patrol the premises, bearing a placard with the inscription "Terminal ice unfair to Drivers, Chauffeurs and Helpers Local Union No. 639," etc.; and that said "picket" has reappeared every day, except Sundays, since the first appearance and continued to "picket" plaintiff's premises bearing the said placard; that a representative of defendants informed various customers of plaintiff that, unless they ceased doing business with plaintiff and gave their ice business to a union company, defendants would "picket" the said customers' places of business on the following morning; that the defendants notified other customers of plaintiff that they should cease doing business with plaintiff and do business with a union ice company, in default of which they would "picket" said customers' premises; that, upon refusal by the said customers to cease doing business with plaintiff, defendant union did in fact "picket" the premises of said customers in many instances, in each of which defendants' "pickets" patrolled in front of the said customers' premises, bearing placards reading: "This place of business uses ice unfair to Drivers, Chauffeurs and Helpers Local Union 639," etc.; and that said overt acts had continued and are continuing at the present time. It is further alleged that said overt acts were done as a part of and in furtherance of the alleged conspiracy to restrain plaintiff's trade and business and force plaintiff to coerce its employees to join the defendant union, to divert plaintiff's business to competitors of plaintiff, and destroy plaintiff's business. It is further charged that said acts constitute a blacklisting of plaintiff and an indirect and secondary boycott of the plaintiff, having for its object an illegal restraint of trade and other illegal objects, and an illegal coercion of the plaintiff, and that said alleged conspiracy and acts committed pursuant thereto have no lawful object. It is further alleged that the plaintiff has suffered great damage and injury by reason of said alleged conspiracy and the acts committed pursuant thereto.

It is urged by the defendants, in support of their motion to dismiss the complaint, that a labor organization con-

stituted of workers engaged in the same trade or occupation as non-union employees of an employer, have a legitimate interest which affords just cause and excuse for peaceable efforts on the part of the members of such labor organization to induce such employer to establish union scale of wages and conditions of employment regardless of whether or not the employees of that employer make such demands. With this, I thoroughly agree. It would be an anachronism to say that an employer should only establish high standards of wages and working conditions upon the insistent demand of his own employees. It would not be realistic to say that workers in competition with employees not enjoying such standards have no substantial interests or legitimate concern in a situation such as stated. Legislation which declared organization of labor to be lawful would be emptied of much substance if the members of such organizations did not have the right to inform each other and the public of their legitimate activities. This right of such labor organization, in these circumstances, to inform its other members and the public generally of the unwillingness of such employer to establish union standards and conditions of work seems to me, in the light of the decisions of the Supreme Court of the United States, and of our own Court of Appeals, to be now beyond question, provided such publicity—whether by means of placards or communications—be accomplished without force or intimidation, and with a bona fide purpose of inducing the employer in question to establish the desired conditions, rather than as a punitive measure visited upon him because he has not done so. It is difficult for me to perceive how a threat to give peaceable publicity to the existence of such a controversy can be said to constitute unlawful coercion. Patronage should and does depend upon public opinion. No channel should be closed by which that public opinion is enlightened as to matters in which it may be legitimately concerned.

And I am further of the opinion that, where peaceful means are employed and the purpose is a legitimate, not a malicious, one, the existence of, and facts concerning, a controversy of this character can properly be made known, not only at the premises of the employer of non-union employees, but also at or near the premises of a dealer who sells the product of such em-

ployer. The so-called "picketing" of the distributor or retailer of such product is distinguishable, I think, from what is generally and loosely called a secondary boycott. There is a unity of interest between the manufacturer and retailer of a product that can, in proper circumstances, justify the publicity at the premises of the latter respecting the labor dispute with the former. If the case of Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, held otherwise and is distinguished, rather than modified, in the recent case of Apex Hosiery Co. v. William Leader et al., 60 S.Ct. 982, 84 L. Ed. ——, decided by the Supreme Court of the United States on May 27, 1940, it is significant that, in that case, there is an admonitory citation to the case of New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, at page 562, 58 S.Ct. 703, at page 707, 82 L.Ed. 1012, in which the Court, speaking through Mr. Justice Roberts, said: "The legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that act. [Citing, among other cases, the Duplex Printing Press Co. case.] It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices."

And it has been definitely settled that the statute, upon which the first cause of action is grounded, does not concern itself with whether or not the means employed pursuant to a conspiracy in restraint of trade and commerce is peaceful or violent. Apex Hosiery Co. v. William Leader, et al., supra. That a labor organization is "to some extent" subject to the Federal Anti-Trust Laws is recognized in that case. The section of the statute involved in that case had to do with conspiracies in restraint of interstate commerce, while the

section of the statute here involved—because the power of the Congress here is not limited by the interstate clause of the Constitution, art. 1, § 8, cl. 3—is directed to conspiracies in restraint of local as well as interstate commerce. Thus, the kinds of commerce are different, but the character of restraint aimed at by the statute is the same; and, as to such character of restraint, it is said, in the Apex Hosiery case, [60 S.Ct. 1002], that, to come within the sweep of the statute, the restraint must, both in purpose and effect, be such as to "monopolize the supply, control its price, or discriminate between its would-be purchasers." If it is not that kind of restraint, then it is not the kind of restraint denounced by the statute here invoked, even though accompanied by wrongful acts for which other remedies may be found. The kind or character of purpose or intent which will bring the activities of the labor organization within the sweep of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, is said by the Court, in the Apex Hosiery case, to be that which was found to be present in the Second Coronado case (Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963), and which alone distinguishes it from the First Coronado case (United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762) and the Leather Workers case (United Leather Workers v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566). That difference, as I understand it, is the difference between activities of a labor organization (regardless of whether such activities are peaceable or violent) which are carried on with the primary purpose of stopping the flow of commerce, the restraint of which is interdicted by the pertinent section of the Sherman Anti-Trust Law, even though there be some remote and resulting benefit to those carrying on such activities, and those activities which are carried on with the primary purpose of securing union standard of wages and conditions of employment (regardless of whether such activities are peaceable or violent), even though the flow of commerce, the restraint of which is interdicted by the pertinent section of the Sherman Anti-Trust Law, is substantially affected, and even though substantial damage and injury is done to an employer with whom the labor organization is engaged in a dispute, provided such obstruction to commerce and injury to the employer is incidental to the primary purpose. This seems to me to be only a different way of saying that it is the difference between a restraint of trade that is not "reasonable" and one that is; that is, the difference between a conspiracy that is malicious in that there is no just cause or excuse based upon legitimate interest, and one that is not malicious, because it is based upon just cause and excuse by reason of the legitimate interests of those concerned.

Whether or not the acts here complained of fall within or without the Sherman Anti-Trust Law, as construed by the Supreme Court, must wait upon proof as to what the facts and circumstances surrounding the alleged conspiracy here complained of actually are. If the purpose and the acts pursuant thereto were established to be as claimed by defendants' counsel, I would have no difficulty at all in concluding that they did not come within the ambit of the sections of the Sherman Anti-Trust Law here in question. However, with the allegations in the bill of complaint mentioned above, which have not yet been denied or explained by the defendants, but which have, for the purposes of the motion to dismiss, been admitted, the case is not in such posture that I can determine the critical purpose and intent pursuant to which the acts of the defendants were done. And so the motion to dismiss in so far as it is addressed to the first cause of action stated in the complaint of the Consolidated Terminal Corporation case must at this time be denied, without prejudice, however, to a renewal at the trial of the cause.

The second cause of action, stated in the complaint in the Consolidated Terminal Corporation case, consists of two counts, both charging libel. The first charges as defamatory, false, scandalous and malicious the communication, dated January 10, 1940, sent by the defendant labor organization to customers of the plaintiff, in which it was stated that plaintiff is the only local ice manufacturer who refuses to recognize or deal with organized labor, and the second count charges that the placards displayed by the "pickets" contained false, scandalous, malicious, defamatory and libelous matter in that they characterized the ice manufactured by the plaintiff as "unfair" to the defendant labor organization. In both of these counts it is set forth that the alleged false statements have great-

ly hurt and injured the plaintiff in its activities, and that the plaintiff has been specially damaged and injured in its business and has sustained loss and damage to reputation and good will, actual loss of business, and loss of profits and in other ways.

It is urged by the defendants that the allegations do not show that the language used is libelous per se, and that the plaintiff has failed to set forth with sufficient particularity the special damages which it is claimed it has suffered. With these contentions, I do not agree. As has been pointed out, labor organizations should and do have a right peaceably to give publicity to labor disputes in which they are interested. Even if such activities do not come within the range of the Sherman Anti-Trust Law, such right of free speech must not be abused. This right to publicize the facts concerning a labor dispute carries with it an obligation of self-restraint to prevent the publication of untruth. It cannot be doubted that the publication of a statement to the effect that a person or corporation, engaged in manufacture and sales to the public, is unfair to organized labor, if in truth and in fact such person or corporation is not unfair to organized labor, results in inevitable damage and loss to that person or corporation. In respect of inevitable damage, such a statement, if false and malicious, can be assimilated to those expressions which are well recognized in the law to be libelous per se, and to contend otherwise is to ignore the realities of present day economic life. Special damages are not required to be stated with any more particularity than the nature of the situation permits. If defendants are embarrassed in their defense, because such damages are not stated with sufficient particularity, they may seek such particularity by an appropriate motion. If false statements have been made maliciously by the defendants concerning the plaintiff, and if the plaintiff has no relief because there is no conspiracy at which the Sherman Anti-Trust Law is aimed, it should nevertheless have the opportunity to establish and recover such damages as it has suffered by reason of such wrongful act. The motion to dismiss as to the second cause of action set forth in the complaint in the Consolidated Terminal case, consisting of the first and second counts for libel, is denied.

In the Singer case, it is urged that the defendants wrongfully conspired to compel the plaintiff to abandon his custom and practice of buying "Terminal ice" from the Consolidated Terminal Corporation, and to sever all contractual connection with the Consolidated Terminal Corporation under his agreement with that corporation, in default of which defendants would ruin plaintiff's business; that it was a part of said illegal conspiracy that, if plaintiff refused to obey the demand of the defendants, they would undertake to "picket" plaintiff's premises and state on placards displayed to the public that plaintiff was unfair to defendant union; that it was a part of said illegal conspiracy that said "pickets" would display on a placard that "Terminal ice" was "unfair," and that plaintiff uses ice "unfair" to defendant union, and that said placards would be carried by "pickets" up and down in front of plaintiff's place of business, displaying prominently to the public the statements thereon; that it was part of the illegal conspiracy that the defendants or their agents would loiter in front of plaintiff's premises and stop persons delivering supplies to plaintiff, such as milk men, bread men, beer drivers and deliverers of liquor, and state to the delivery men that plaintiff was unfair to the defendant union, and that the said delivery men, themselves labor men, were not allowed by the rules of their union to violate the said "picket line" to deliver supplies to plaintiff; that it was also part of said conspiracy to attempt, by the operation of said "pickets" and placards, to impress upon the public that plaintiff was involved in union labor difficulties with the defendants, and to persuade any customers who might be members of labor unions to refrain from entering upon plaintiff's premises and dealing with plaintiff. It is alleged that, pursuant to said alleged conspiracy, the defendants have committed the following overt acts: That defendants sent two of their agents to plaintiff's restaurant, who stated they were from defendant union, that the plaintiff bought "Terminal ice," that the makers of "Terminal ice" were not a union shop, and demanded that the plaintiff and his employees cease using "Terminal ice" or dealing with its makers, the Consolidated Terminal Corporation, that, if plaintiff did not cease using "Terminal ice" and dealing with the Consolidated Terminal Corporation, the defendant union would "picket" plaintiff's restaurant; that subsequently agents of the defendant sat in a parked car in front of plaintiff's restaurant for a long period of time and

advised certain delivery men that plaintiff was using non-union "Terminal ice," that "pickets" would be established in front of plaintiff's restaurant, and that said delivery men could not deliver any supplies to plaintiff; that the delivery men referred to were employed by the following companies: Richfield Dairy, Crusty Pie Company, National Brewery Company, Heurich Brewery Company, Anheuser-Busch Brewery, and Old German Brewery Company; and that said delivery men, upon being warned by defendants' agents, all went away, stating they could not pass a "picket line" and could not deliver supplies to plaintiff in violation of the instructions of defendants' agents; that thereafter defendants placed two "pickets" in front of plaintiff's restaurant, each bearing placards, upon one of which was the following inscription: "This place of business uses ice unfair to Drivers, Chauffeurs and Helpers Local Union 639 affiliated with Teamsters Joint Council No. 55 and Wash Central Labor Union and A. F. of L." and upon the other of which was the following inscription: "Terminal ice unfair to Drivers, Chauffeurs and Helpers Local Union 639, affiliated with Teamsters Joint Council 55 and Wash Central Labor Union and A. F. of L."; that said "pickets" walked up and down in front of plaintiff's restaurant, and that they have continued and are continuing so to do; that subsequently agents of defendants stopped a delivery man from the Richfield Dairy who was attempting to deliver milk and a delivery man from the Crusty Pie Company attempting to deliver pies; that defendants' agents warned each that plaintiff was in trouble with the union, and that they must not deliver anything to plaintiff; and, finally, that thereafter agents of the defendants again appeared in an automobile parked in front of plaintiff's restaurant and again warned delivery men that no deliveries could be made to plaintiff's restaurant, all of which acts, it is alleged, were in furtherance of the said conspiracy on the part of defendants to coerce plaintiff to cease using "Terminal ice" and to cease dealing with the Consolidated Terminal Corporation, makers thereof, and were also done to restrain plaintiff in his right to contract freely with individuals and companies of his choice and freely to trade with persons doing business in Washington, D. C., which it is averred constitutes a blacklisting of plaintiff and an indirect and secondary boycott of plaintiff,

having for its object an illegal restraint of trade and an unlawful coercion of plaintiff. It is further alleged that, as a result, plaintiff Singer has suffered great injury by reason of the alleged intimidation, false statements and inability to obtain articles of food and drink necessary to the conduct of plaintiff's business. The plaintiff further alleges that he is in no way connected with the Consolidated Terminal Corporation, makers of "Terminal ice;" that he has sustained irreparable injury, wherefore the plaintiff asks for damages, to be trebled, together with reasonable counsel fees and costs, pursuant to the provisions of the Federal Anti-Trust Laws, Secs. 3 and 15, Ch. 1, 15 U.S.C.A. The plaintiff Singer also asks in his complaint for a temporary restraining order, and to be later granted a permanent injunction, restraining the defendants from conducting an indirect and secondary boycott and blacklisting plaintiff, and from in any way interfering with plaintiff's conduct of his own business by threats, intimidation, coercion, "picketing," or otherwise.

What has been said with reference to the first cause of action in the Consolidated Terminal suit has equal application here, because, as stated, if the purpose and acts of the defendants are not of the character which fall within the sections of the Sherman Anti-Trust Law in question, they do not give rise to an action under that Act. Under the allegations of the complaint in the Singer case, however, which are admitted for the purposes of the motion to dismiss, this case too must await proof of the facts and circumstances before it can be determined whether or not the provisions of the Sherman Anti-Trust Law are applicable. And so the motion to dismiss this complaint must at this time be denied, without prejudice, however, to a renewal at the trial of the cause.

■■■ With respect to the prayer in the complaint in the Singer case for a temporary and permanent injunction, I am convinced that, within the meaning of the Norris-LaGuardia Act, Secs. 104, 107 and 113, Ch. 6, 29 U.S.C.A., there exists a "labor dispute" between such persons, although not standing in the proximate relation of employer and employee, which deprives this Court of jurisdiction to grant injunctive relief. As the complaint, for the reasons above stated, cannot at this time be dismissed, the allegations and prayer for injunctive relief is considered, surplusage.