## UNITED STATES v. GREATER KANSAS CITY CHAPTER NAT. ELECTRICAL CONTRACTORS ASS'N et al.

### No. 5287.

United States District Court
W. D. Missouri, S. D.
Jan. 18, 1949.

John F. Sonnett, Asst. Atty. Gen., Edward R. Kenney, Sp. Asst. to Atty. Gen., Donald P. McHugh and William E. Speer, Sp. Attys., both of Washington, D. C., and Sam M. Wear, U. S. Atty., of Kansas City, Mo., for plaintiff.

William R. Collinson, of Springfield, Mo., Lancie L. Watts, of Kansas City, Mo., Paul R. Barnett, Hugh B. Downey and Harry A. Morris, all of Kansas City, Mo., for defendants.

REEVES, Chief Judge.

While many reasons for the dismissal of the indictment are enumerated in the motion to dismiss yet the several grounds are epitomized in the first averment, which is, "The indictment does not state facts sufficient to constitute an offense against the United States of America."

The indictment charges that the defendants are electrical contractors in the Springfield area (Springfield, Missouri, and its environs); that the business carried on by them is the "installation, alteration or repair of electrical systems" in the said area; that the business done by them is large, exceeding for instance, $500,000 during the year 1946; that the electrical equipment used by the defendants, or at least three-fourths of it, was and is produced at factories located outside the State of Missouri and shipped in interstate commerce into said Springfield area; that such equipment was purchased both by the defendants and builders and owners using the services of the defendants; and that the "conspiracy" which began in the year 1946 is as follows:

"* * * the defendants * * * have been engaged in a combination and conspiracy in restraint of the aforesaid trade and commerce among the several states in electrical equipment and electrical contracting services in violation of Section 1 of the act of Congress of July 2, 1890 as amended (15 U. S. C. Section 1), commonly known as the Sherman Act."

The details of the conspiracy alleged are as follows:

"* * * a continuing agreement and concert of action among the defendants * * * that the defendant electrical contractors agree that they will not enter into contracts with owners or builders to supply only the labor required in the installation, alteration or repair of electrical systems, unless said owners or builders will pay an additional sum representing a substantial part or all of the profit said contractors would have realized if the electrical materials had been supplied by them."

This was followed by an averment that this combination or agreement was effectuated or consummated by overt acts.

1. The act alleged to have been violated is the familiar one known as the Sherman Act of 1890, found in § 1, Title 15 U.S.C.A. and is as follows:

"Every contract, * * * or conspiracy, in restraint of trade or commerce among the several States * * * is hereby declared to be illegal: * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both such punishments, in the discretion of the court.

It is noted from the foregoing pertinent excerpt that the offense or crime under the statute is a combination or conspiracy in restraint of trade or commerce among the several states. In an indictment it is not sufficient merely to state as a conclusion that the combination or agreement was in

restraint of trade but such details must be given as to show in what manner interstate commerce or trade was restrained by the alleged contract, combination or conspiracy. Frankfort Distilleries v. United States, 10 Cir., 144 F.2d 824. It must appear logically and reasonably that the combination or conspiracy, if carried out, would necessarily have the effect to limit and restrain commerce.

2. An analysis of the indictment in this case does not disclose such an effect. The defendants were engaged in "installing, altering or repairing electrical systems." No inferences could be drawn from the averments of the indictment that the defendants would profit or benefit by any restriction or restraint upon the free flow of electrical equipment into the area where they carried on their activities. On the contrary, the averments of the indictment showed that they did a large business in the year 1946, and there was no suggestion that by their exactions of owners and builders the free flow of commerce in electrical supplies suffered an impairment or diminution.

■ 3. The specific combination and conspiracy charged in the indictment was that the defendants would make no contract with any owner or builder unless such owner or builder would agree to pay "an additional sum representing a substantial part or all of the profit said contractors would have realized if the electrical materials had been supplied by them." The meaning of this arrangement was that, if the defendants supplied all the labor for installations, alterations or repairs, then they should be paid an additional amount equal to a part or all of the profits the owners or builders would realize if such owners or builders purchased and supplied the equipment or material used in such installations, alterations or repairs. There was no averment which indicated a menace or a threat to the free flow of interstate commerce. The owner or builder had an option either to purchase the equipment necessary for the installation, etc., and then divide or pay all the profit over to the defendants or to permit the defendants to purchase and supply the equipment and material along with their labor. By such

an arrangement there was no restraint upon interstate commerce and without a combination or agreement or a conspiracy to restrain commerce there can be no violation of the law.

■ 4. Assuming that the defendants were indispensable to the installations, etc., of electrical systems in that area or community, and, assuming further, that their refusal to contract with the owners and builders unless they complied with their (defendants') demands, would impede and interfere with the free flow of interstate commerce, yet, under the express ruling of the Supreme Court in Apex Hosiery Co. v. Leader et al., 310 U. S. 469, loc. cit. 482, 483, 484, 485, 486, 490, 492, 493, 497, 498, 500 and 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, this would not be sufficient and they would not be guilty of violating the law.

■■ As indicated in that lengthy opinion, the Sherman Anti-Trust Law was and is but an exposition of the common law and common law doctrines in restraint of trade. The national government, unlike the State of Missouri and practically all the other states in the Union, could not and did not undertake to adopt the common law as a part of the national code. It was necessary, therefore, in its manifold activities and particularly in the regulation of interstate commerce over which it had constitutional regulatory authority, to express by positive enactment the doctrines of the common law. The act, therefore, is to be interpreted in the light of the common law as it is construed. The object of both the common law and our statutory law was to prevent trusts and combinations of business and of capital organized and directed to the controlling of the market by suppression of competition in the marketing of goods and services. The reason for the law was the monopolistic tendency which had become a matter of public concern, and, "The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public in-

jury." 310 U. S. loc. cit. 493, 60 S.Ct. loc. cit. 992.

In the Apex Hosiery case, supra, the defendants had conducted a sit-down strike and had destroyed property and damaged merchandise intended for interstate commerce. They had refused to permit the shipment of the merchandise so that it might enter the channels of interstate commerce. The object of the defendants, however, was "to compel petitioner to accede to the union demands and an effect of it, in consequence of the strikers' tortious acts, was the prevention of the removal of petitioner's product for interstate shipment." 310 U. S. loc. cit. 501, 60 S.Ct. loc. cit. 996.

The court then announced a doctrine applicable here:

"So far as appears the delay of these shipments was not intended to have and had no effect on prices of hosiery in the market, and so was in that respect no more a restraint forbidden by the Sherman Act than the restriction upon competition and the course of trade held lawful in Appalachian Coals Inc., v. United States, supra [288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825], because notwithstanding its effect upon the marketing of the coal it nevertheless was not intended to and did not affect market price."

In the Apex Hosiery case the Circuit Court of Appeals, 3 Cir., 108 F.2d 71, had reversed a judgment against the defendants in a civil proceeding and the Supreme Court affirmed the decision of the Court of Appeals.

In the Apex Hosiery case the court found that the effect of the demands and actions of the defendants "was to restrict substantially the interstate transportation of its manufactured product, so as to bring the acts of respondents by which the restriction was effected within the reach of the commerce power if Congress has seen fit to exercise it. Cessation of petitioner's manufacturing operations, which respondents compelled, indubitably meant the cessation of shipment interstate. *The effect upon the commerce resulted naturally and inevitably from the cause.*" (Emphasis mine.) 310 U. S. loc. cit. 484, 60 S.Ct. loc. cit. 987.

In the instant case there is not a single averment that the free flow of commerce was affected or would have been affected in any way whatsoever by the exactions made by the defendants upon owners and builders.

5. As said in United States v. Yellow Cab Co., 332 U. S. 218, loc. cit. 225, 67 S.Ct. 1560, loc. cit. 1564, 91 L.Ed. 2010:

"Section 1 of the Act outlaws unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected."

And, again, 332 U. S. loc. cit. 227, 67 S.Ct. loc. cit. 1565:

"The test of illegality under the Act is the presence or absence of an unreasonable restraint on interstate commerce."

The acts here charged did not remotely affect interstate commerce. Whether the defendants furnished the equipment or whether the owners and builders furnished the electric materials, the flow of commerce would continue just the same. The contract of the defendants against which the indictment complains was purely and entirely intrastate. In that respect it fell squarely within the "dead chicken" case of A. L. A. Schechter Poultry Corp. v. United States, 295 U. S. 495, loc. cit. 547, 55 S.Ct. 837, loc. cit. 850, 79 L.Ed. 1570, 97 A.L.R. 947, where the court said, in differentiating between interstate and intrastate commerce:

"Where a combination or conspiracy is formed, with the intent to restrain interstate commerce or to monopolize any part of it, the violation of the statute is clear. Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L.Ed. 963. *But, where that intent is absent, and the objectives are limited to intrastate activities, the fact that there may be an indirect effect upon interstate commerce does not subject the parties to the federal statute, notwithstanding its broad provisions.*" (Emphasis mine.)

6. Counsel for the government rely, as do opposing counsel upon a veritable wilderness of citations and authorities but specific reliance is placed upon the case of United States v. General Motors Corporation, 7 Cir., 121 F.2d 376. The facts in that case:

do not compare with the facts alleged in the case under consideration. General Motors Corporation undertook, after it had parted with title to its products, to coerce its dealers into financing the sale of automobiles through the General Motors Acceptance Corporation and the General Motors Acceptance Corporation of Indiana, Inc. It denied to its 15,000 dealers who bought and became invested with title to the motor vehicles manufactured by it, their freedom to do business with a multitude of independent finance companies in the retail sales of motor vehicles. The exhaustive opinion in that case does not apply here.

While it is conjectured by counsel for the government that the effect of the exactions made by the defendants upon owners and builders would limit the flow of electrical equipment and material to the ultimate consumer, yet the averments of the indictment do not justify that speculation.

In view of the above discussion it should be held that the indictment does not state, as claimed by the defendants, facts sufficient to constitute an offense against the United States of America, and, accordingly, the motion to dismiss should be and will be sustained.