UNITED STATES v. GOLD et al.

No. 81.

Circuit Court of Appeals, Second Circuit.

Nov. 4, 1940.

Louis B. Brodsky, of New York City, for appellants Gold, Schneider, and Winogradsky.

Paul O'Dwyer, of Brooklyn, N. Y., for appellants Potash, Weil, Burt, Weiss, Lauber, Paul, Mileaf, and Schwartz.

Kenneth E. Walser, Nathan Greene, and Andre Maximov, all of New York City, of counsel for appellants.

Thurman Arnold, Asst. Atty. Gen., Berkeley W. Henderson, Sp. Asst. to Atty. Gen., and Marvin J. Coles and Emanuel S. Cahn, both of New York City, for the United States.

Liebman, Robbins, Pressman & Leider, of New York City (Lee Pressman, Joseph Kovner, and Anthony Wayne Smith, all of Washington, D. C., of counsel), for Congress of Industrial Organizations, amicus curiae.

Benedict Wolf, of New York City, for National Lawyers Guild, amicus curiae.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

These appeals are from judgments of conviction of the accused for a conspiracy to restrain trade in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. The only question we shall consider is whether the evidence supports the verdict, the facts which the jury might have found to be proved being as follows. About ninety per cent of the manufacturers of fur garments in the United States do their business in the City of New York, buying the raw skins from dealers who have imported them from foreign countries and other states. The first process of manufacture is dressing and dyeing which the manufacturer ordinarily does not do himself; he contracts for this service with dressers and dyers who have their own factories and employ their own workmen and most of whom are in New Jersey. Thus skins must cross the state line twice

before they return to the manufacturers to be cut and sewn. At the time of the conspiracy, the year 1932, the Needle Trades Workers' Industrial Union, a large nation-wide union, had established itself in the fur business in New York, though its hold there was as yet small. Most of the business had already been unionized by the International Fur Workers, another large union; the rest was not unionized at all. The Needle Workers started a campaign to bring the whole industry within their union, including not only employees of the manufacturers but of the dressers and dyers as well. Among the dressers and dyers were three large firms in Newark, New Jersey: A. Hollander and Son, Joseph Hollander, Inc., and Philip A. Singer & Brother. All of these operated non-union plants, and the officers of the Needle Workers—the accused at bar—directed their main attack against them, striving to compel them to employ only the union's own members. The means they used to accomplish this were in general to picket the factories and persuade employees to join the union, to warn the New York manufacturers not to send their skins to them to be dressed and dyed and to direct their own members in the New York manufacturers' plants to refuse to work up any skins dressed and dyed by the offending three firms. There was abundant evidence from which a jury could find that this three-fold attack was carried out with utter lawlessness and violence; and there can be no question that if the strikers did in fact restrain trade within the meaning of the Sherman Act, the restraints used were "unreasonable" to the last degree.

The case was tried before the decision of the Supreme Court in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, before which it had been quite commonly supposed that the Sherman Act covered, not only concerted action intended to control prices or supply, or resulting in such control, but generally all action which so far affected interstate commerce as to be within the constitutional power of Congress at all; that is, that Congress in the Sherman Act had meant to exercise its power as broadly as possible. This view the court repudiated in the Apex case. Its reasoning was that the act had been passed only to implement the common law as to restraints of trade; and that, although it imposed. its own liabilities, civil and criminal, be-

sides providing remedies for their breach, nevertheless it took the common law as its model, creating federal rights and duties fashioned after existing precedents. So much the court had often said before, and the new contribution was that, turning to those precedents, it now held that the only restraints forbidden were those which limited competition in "business and commercial transactions," and which "tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services," 310 U.S. at page 493, 60 S.Ct. at page 992, 84 L.Ed. 1311, 128 A.L.R. 1044. These were no chance words; they were the burden of the reasoning by which the court affirmed a reversal by the Circuit Court of Appeals. For example, the contracts must be "for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market" 310 U.S. at page 497, 60 S.Ct. at page 994, 84 L.Ed. 1311, 128 A.L.R. 1044. Again; "restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price." 310 U.S. at page 500, 60 S.Ct. at page 996, 84 L.Ed. 1311, 128 A.L.R. 1044. See, also, 310 U.S. at pages 501, 507, 512, 60 S.Ct. 996, 999, 1002, 84 L.Ed. 1311, 128 A.L.R. 1044. Mere restraints upon transportation of goods across state lines were therefore not enough; they must be in execution of a plan to restrict market competition, or that must be their necessary result. Furthermore, the argument was necessary to the decision because not only had the "sit-down" strikers entirely stopped the manufacture of goods, 80 per cent of which would have gone into interstate commerce; but their leader expressly refused to allow any finished goods—of which there was a large amount on hand—to leave the factory. It was a complete answer to these wrongs—which the court condemned without stint—that the plaintiff had not shown that the strike had had any substantial commercial effect upon either the prices at which the goods were sold or the supply upon the market, and that they had not prejudiced consumers in any other way.

So far as concerns the skins themselves, the case at bar is even weaker;

for, although the accused tried to stop any raw skins from crossing from New York to New Jersey to be dressed and dyed by the Hollanders and Singer and from returning to New York to be cut and sewn, they did not by so doing interfere with marketing of any kind. Dressing, dyeing, cutting and sewing are all processes in the manufacture of garments; the skins were not sold to the dressers and dyers, nor were they resold by them to the manufacturers; moreover, so far as appears, the price and supply of the resulting garments were not in fact affected by the strike. We may assume arguendo that, if the dealers had sent the skins to the dressers and dyers and sold them to the manufacturers from the dressing and dyeing plants, a combined refusal to work up such skins —if "widespread" enough to affect prices or supply—would have been in "restraint of trade"; but there is no evidence in the record that any part of the business was done in that way.

Nevertheless, there may be a restraint of trade in services as well as in goods, and the argument we have just made will not hold as to the service of dressing and dyeing. We must not indeed confuse the services to their employers of the employees of the Hollanders and Singer with the services of the Hollanders and Singer to the manufacturers. There can be no question that the accused intended to acquire a monopoly of the whole supply of the services rendered by the employees; that is indeed the object of most unions. But the court in the Apex Case expressly declared that the Sherman Act did not cover any restraint of competition in such services (310 U.S. at pages 502, 503, 60 S.Ct. at page 997, 84 L.Ed. 1311, 128 A.L.R. 1044) and we must therefore disregard any effect upon them which the accused may have intended or caused. Coming then to the service of the dressers and dyers, they picked up the skins in New York, dressed and dyed them in New Jersey and returned them to the manufacturers in New York; and, as all this was done by a single contract, they must be held to have sold to the manufacturers - a service in substantial measure interstate. The accused therefore · restrained the "market-

ing" of an interstate service, as they did not restrain the "marketing" of the skins themselves. It is true that their purpose was not to control prices or supply; they were indifferent to these except as a sanction for bending the three obdurate firms to their will. But purpose is never an excuse in these cases; only the intent of the accused, or the necessary result of his conduct, counts, and it would appear enough that here they intended to stop all "marketing" of service. So far, therefore, the case at bar is on all fours with a number of earlier decisions, except that they dealt with goods instead of services. Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Co. v. Journeyman Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791. Nevertheless there was one element lacking which was present in the decisions just cited, and which the court thought crucial in the Apex case. Although the accused at bar intended to stop the marketing of the services of the three recalcitrant firms, the operations of those firms were not shown to have been upon a large enough scale to make their cessation affect market conditions in New York. That that is now an essential element appears from the following extract out of the opinion in the Apex case: "It will be observed that in each of these cases where the Act was held applicable to labor unions, the activities affecting interstate commerce were directed at control of the market and were so widespread as substantially to affect it." 310 U.S. at page 506, 60 S.Ct. at page 999, 84 L. Ed. 1311, 128 A.L.R. 1044. That can only mean that unless the strike is so "widespread" as to affect prices or supply, it is not "restraint of trade," even though it is directed against the "marketing" of goods or services. It is certainly not for us to say how far the four decisions cited lend themselves to such a distinction; the court itself was not unanimous upon the point. We have only to follow the decision made.

Convictions reversed.