**INTERNATIONAL LADIES' GARMENT WORKERS' UNION et al. v. DONNELLY GARMENT CO. et al.**

No. 11605.

Circuit Court of Appeals, Eighth Circuit.

June 5, 1941.

Judgment Modified July 11, 1941.

See 121 F.2d 561.

See, also, D.C., 23 F.Supp. 998.

Emil Schlesinger, of New York City (Nathan Greene, of New York City, Charles A. Horsky, of Washington, D. C., Jerome Walsh, of Kansas City, Mo., and Joseph A. Padway, Graham Claytor, Jr., and Covington, Burling, Rublee, Acheson & Shorb, all of Washington, D. C., on the brief), for appellants.

James A. Reed and William S. Hogsett, both of Kansas City, Mo. (Robert J. Ing-

raham, of Kansas City, Mo., on the brief), for appellee Donnelly Garment Co. and another.

Frank E. Tyler, of Kansas City, Mo. (Thomas J. Patten and Lucian Lane, both of Kansas City, Mo., on the brief), for appellees Donnelly Garment Workers' Union.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

This action grows out of an attempt by the International Ladies' Garment Workers' Union (hereinafter called the International) to compel the employees of the Donnelly Garment Company, of Kansas City, Missouri, a large manufacturer of women's dresses, doing a nation-wide business, to join the International and to force the Company to coerce its employees into joining the International, although none of them is a member of that union and all of them have served notice upon the Company that they do not choose to be represented by the International for purposes of collective bargaining. The means which the plaintiffs charge that the International proposes to use to compel the unionization of the Company's employees are, in brief, forceful and mass picketing in order to close the factory, and a secondary boycott against the customers of the Company to induce them to refuse to purchase its product. The Donnelly Garment Company and its affiliate, the Donnelly Garment Sales Company, as plaintiffs, brought this action to enjoin the International, its officers and agents, as defendants, from committing acts of fraud and violence and from boycotting the plaintiffs' customers in furtherance of an alleged conspiracy in restraint of interstate trade and commerce, in violation of the Sherman Act, 15 U.S.C.A. § 1 et seq. The Donnelly Garment Workers' Union, an independent labor organization of the employees of the Donnelly Garment Company, and the representatives of that organization intervened. The interveners asked that the plaintiffs have the relief which they prayed for and that, in addition, the plaintiffs be enjoined from recognizing the International as the representative of the employees for purposes of collective bargaining. After the sufficiency of the plaintiffs' amended complaint to state a claim upon which relief could be granted had been sustained by this Court (99 F.2d 309), issues were joined, and the

case was tried. The findings of fact and conclusions of law of the court below were in favor of the plaintiffs and the interveners, and the court entered a decree enjoining the defendants from committing acts of fraud and violence and from conducting a secondary boycott in furtherance of their alleged conspiracy to restrain the interstate trade and commerce of the plaintiffs. From this decree the defendants have appealed.

The decree is challenged upon many grounds, but the question which must first be determined is that of jurisdiction. Jurisdiction is predicated solely upon the Sherman Act, and if that Act is inapplicable, as the defendants assert, the court below was without jurisdiction.

By the terms of the Sherman Act, a federal court has power to enjoin "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations", 15 U.S.C.A. § 1, subject, of course, to the immunities, conditions and limitations contained in § 20 of the Clayton Act, 29 U.S.C.A. § 52, and in the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115. See Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 100, 61 S.Ct. 122, 85 L.Ed. ——, and United States v. Hutcheson, 312 U.S. 219, 231, 61 S.Ct. 463, 468, 85 L.Ed. ——. A federal court cannot, of course, acquire jurisdiction under the Sherman Act to enjoin contracts, combinations or conspiracies which are not in restraint of trade or commerce within the meaning of the Act. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. Therefore, the controlling issue on the question of jurisdiction is whether the concerted action of the defendants constituted a combination or conspiracy "in restraint of trade or commerce among the several States."

In considering the question of jurisdiction, we accept as established the following facts: That the Donnelly Garment Company has a large manufacturing plant at Kansas City where it employs some 1,300 persons and makes women's dresses which are sold in interstate commerce through the Donnelly Sales Company to retailers throughout the United States. That the Donnelly Garment Company's annual sales amount to approximately $5,000,000. That its relations with its employees have always been harmonious. That the hours which they are required to work, the wages

paid to them, and the working conditions in the factory are better than those in similar factories which have been unionized by the defendants. That the defendants have at all times during the existence of their controversy with the plaintiffs insisted that the Donnelly Garment Company disregard the wishes of its employees with respect to representation for purposes of collective bargaining, that it recognize the International as the exclusive bargaining agent for all of the Company's employees, and that the Company disregard the contracts which it has entered into with its employees, through their independent union, relative to representation, hours, wages and working conditions. That the plaintiffs have determined that they will not coerce the employees of the Donnelly Garment Company with respect to representation and will not compel them to join the International. That, unless restrained, the defendants will, through acts of fraud and violence and the use of a secondary boycott, destroy the interstate trade and commerce of the plaintiffs, in furtherance of the determination of the International to unionize the employees of the Donnelly Garment Company.

■ Since fraud and violence do not condition jurisdiction under the Sherman Act (Apex Hosiery Co. v. Leader, 310 U. S. 469, 513, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044), those factors will be left out of consideration. The question, then, is whether a labor union which proposes to effect the unionization of the employees of an employer engaged in interstate commerce by stopping production and distribution of his goods through closing his factory and inducing his customers in other states, by picketing their places of business, not to purchase his goods, constitutes a violation of the Sherman Act in the absence of proof that the intention of the union, or the necessary effect of its threatened activities, is to control or substantially to affect, to the detriment of consumers, the market for the class of goods which the employer produces.

■ If the efforts of the International were directed solely at stopping production at the plant of the Garment Company at Kansas City, Missouri, the court below would clearly have been without jurisdiction, under Apex Hosiery Co. v. Leader, supra, which, so far as such efforts are concerned, is not distinguishable from this case. The question, then, is whether the activities of the International which were directed at inducing the customers of the Company to refuse to purchase its goods constituted such a restraint upon interstate commerce as to bring the entire combination or conspiracy within the Sherman Act and to enable the court below to enjoin all acts of fraud and violence affecting either production or distribution.

This case was tried upon the theory that the plaintiffs' interstate commerce was protected by the Sherman Act against all restraints which obstructed the free flow of commerce between the states or which restricted "the liberty of a trader to engage in business." Loewe v. Lawlor, 208 U.S. 274, 293, 28 S.Ct. 301, 303, 52 L.Ed. 488, 13 Ann.Cas. 815. The plaintiffs regarded as applicable to their situation the principles announced in that case and in other like cases which followed it. Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L. Ed. 341; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L. Ed. 349, 16 A.L.R. 196; Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S. Ct. 551, 69 L.Ed. 963. The plaintiffs did not attempt to show that the destruction of their interstate commerce would materially reduce the supply of women's dresses upon the market, or would affect the market prices of such dresses, or would confer market control of women's dresses upon the International, or would destroy or substantially affect competition in the dress market; nor was there any evidence that the International had any motive for its threatened activities other than to force the employees of the Donnelly Garment Company to become members of the International and be represented by it for purposes of collective bargaining.

When this case was tried it was generally believed that concerted action by a labor union to compel an employer to yield to its demands under threat of destruction of his interstate trade and commerce through a secondary boycott or otherwise was prohibited by the Sherman Act, regardless of whether that interstate trade was large or small and regardless of the effect of its destruction upon the general market for the class of goods which the employer produced. United States v. Needle Trades Workers' Industrial Union, D.C.S.D.N.Y., 10 F.Supp. 201; United

States v. Gold, 2 Cir., 115 F.2d 236. The plaintiffs contend that Apex Hosiery Co. v. Leader, supra, has effected no material change in the construction of the Act, the strike situation in that case being purely local in character. The defendants argue that it now clearly appears from the Apex case and other cases subsequently decided by the Supreme Court that the court below was without jurisdiction under the Sherman Act.

It is to be noted that the Apex case actually involved two types of restraint: a restraint upon production caused by depriving the Apex Company of its factory, thus preventing the manufacture of hosiery; and a restraint upon the delivery in interstate commerce to the customers of the Company of some $800,000 worth of the finished product, due to a refusal to permit the Company to use the product to fill the orders of customers. It is apparent from the decision in the Apex case that the Supreme Court was of the opinion that the Sherman Act was inapplicable to labor union activities in restraint of interstate commerce "which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to 'monopolize the supply, control its price, or discriminate between its would-be purchasers.'" 310 U.S. at page 512, 60 S.Ct. at page 1002, 84 L.Ed. 1311, 128 A.L.R. 1044.

The Circuit Court of Appeals of the Second Circuit, in United States v. Gold, 115 F.2d 236, had occasion to construe the decision in the Apex case with respect to a situation much like that with which we are concerned. In that case a union had sought to destroy the interstate commerce of three fur-dressing concerns in New Jersey, (1) by preventing them, through forceful picketing, from dressing and dyeing furs, (2) by preventing members of the union in the plants of manufacturers in New York City from working upon any skins dressed and dyed by the fur-dressing concerns, and (3) by preventing New York customers of the fur-dressing concerns from sending them furs to be dressed and dyed. An indictment against the union and its officers for violating the Sherman Act was sustained (United States v. Needle Trades Workers' Industrial Union, D.C., 10 F.Supp. 201); the case was tried, and convictions resulted. Appeals were taken, and the case was reversed because of the Apex case. Judge Learned Hand, in delivering the opinion of the court, after pointing out that if the union did in fact restrain trade within the meaning of the Sherman Act, the restraints used were "'unreasonable' to the last degree", said (115 F.2d at pages 237 and 238):

"The case was tried before the decision of the Supreme Court in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, before which it had been quite commonly supposed that the Sherman Act covered, not only concerted action intended to control prices or supply, or resulting in such control, but generally all action which so far affected interstate commerce as to be within the constitutional power of Congress at all; that is, that Congress in the Sherman Act had meant to exercise its power as broadly as possible. This view the court repudiated in the Apex case. Its reasoning was that the act had been passed only to implement the common law as to restraints of trade; and that, although it imposed its own liabilities, civil and criminal, besides providing remedies for their breach, nevertheless it took the common law as its model, creating federal rights and duties fashioned after existing precedents. So much the court had often said before, and the new contribution was that, turning to those precedents, it now held that the only restraints forbidden were those which limited competition in 'business and commercial transactions,' and which 'tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services,' 310 U.S. at page 493, 60 S.Ct. at page 992, 84 L.Ed. 1311, 128 A.L.R. 1044. These were no chance words; they were the burden of the reasoning by which the court affirmed a reversal by the Circuit Court of Appeals. For example, the contracts must be 'for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market' 310 U.S. at page 497, 60 S.Ct. at page 994, 84 L.Ed. 1311, 128 A.L.R. 1044. Again, 'restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price.' 310 U.S. at page 500, 60 S.Ct. at page 996, 84 L.Ed. 1311, 128 A.L.R. 1044. See, also, 310 U.S. at pages 501, 507, 512, 60 S.Ct. 996, 999, 1002, 84 L.Ed. 1311, 128 A.L.R. 1044. Mere

restraints upon transportation of goods across state lines were therefore not enough; they must be in execution of a plan to restrict market competition, or that must be their necessary result. Furthermore, the argument was necessary to the decision because not only had the 'sit-down' strikers entirely stopped the manufacture of goods, 80 per cent of which would have gone into interstate commerce; but their leader expressly refused to allow any finished goods—of which there was a large amount on hand—to leave the factory. It was a complete answer to these wrongs—which the court condemned without stint—that the plaintiff had not shown that the strike had had any substantial commercial effect upon either the prices at which the goods were sold or the supply upon the market, and that they had not prejudiced consumers in any other way.

\* \* \* \* \* \*

"The accused therefore restrained the 'marketing' of an interstate service, as they did not restrain the 'marketing' of the skins themselves. It is true that their purpose was not to control prices or supply; they were indifferent to these except as a sanction for bending the three obdurate firms to their will. But purpose is never an excuse in these cases; only the intent of the accused, or the necessary result of his conduct, counts, and it would appear enough that here they intended to stop all 'marketing' of service. So far, therefore, the case at bar is on all fours with a number of earlier decisions, except that they dealt with goods instead of services. Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791. Nevertheless there was one element lacking which was present in the decisions just cited, and which the court thought crucial in the Apex case. Although the accused at bar intended to stop the marketing of the services of the three recalcitrant firms, the operations of those firms were not shown to have been upon a large enough scale to make their cessation affect market conditions in New York. That that is now an essential element appears from the following extract out of

the opinion in the Apex case: 'It will be observed that in each of these cases where the Act was held applicable to labor unions, the activities affecting interstate commerce were directed at control of the market and were so widespread as substantially to affect it.' 310 U.S. at page 506, 60 S.Ct. at page 999, 84 L.Ed. 1311, 128 A.L.R. 1044. That can only mean that unless the strike is so 'wide-spread' as to affect prices or supply, it is not 'restraint of trade,' even though it is directed against the 'marketing' of goods or services. It is certainly not for us to say how far the four decisions cited lend themselves to such a distinction; the court itself was not unanimous upon the point. We have only to follow the decision made."

The Government in United States v. Gold, 2 Cir., 115 F.2d 236, had insisted that the secondary boycott aspect of the case distinguished it from the Apex case and made the Sherman Act applicable. The following statement appears in the Government's brief in the Gold case: "It must be borne in mind that there [the Apex case] the union's activities were confined to the strike at the one plant of the Company and were essentially local in scope. In the instant case, however, the union not only conducted strikes against the dressers and dyers in New Jersey, which taken alone would also be local operations, but extended their efforts to bring such dressers and dyers in line by exerting pressure upon their customers in another state. And in the exertion of such pressure on persons and firms other than the one with which the labor dispute existed lies the distinction between this case and the Apex case."

The Court of Appeals of the Second Circuit evidently did not believe that the addition of a secondary boycott to the other afflictions visited upon the Apex Company would have produced a different decision in the Apex case.

Since the decision of the Apex case, the Supreme Court has decided Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. ——, and United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. ——. In the first of these cases it was held that the picketing by A. F. of L. milk wagon drivers of the customers of C.I.O. "vendors" of milk constituted a labor dispute within the meaning of the Norris-LaGuardia Act and was subject to the restrictions

imposed by that Act upon the granting of injunctions. It had been contended in that case that the activities of the A.F. of L. milk wagon drivers in picketing the customers of the C.I.O. milk "vendors" constituted an unlawful secondary boycott, the purpose of which was not to unionize the C.I.O. "vendors", but to obtain for the A. F. of L. drivers a Chicago milk monopoly at a sustained high price level, in violation of the Sherman Act, and that their activities could therefore be enjoined. In its decision, the Supreme Court, in discussing the legislative history of § 20 of the Clayton Act, 29 U.S.C.A. § 52, and of the Norris-LaGuardia Act, referred to reflections cast by committees of Congress upon the construction by the Supreme Court of the Clayton Act in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360, and Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791, and then said (311 U.S. at page 103, 61 S.Ct. at page 128, 85 L.Ed. ——) :

"Whether or not one agrees with the committees that the cited cases constituted an unduly restricted interpretation of the Clayton Act, one must agree that the committees and the Congress made abundantly clear their intention that what they regarded as the misinterpretation of the Clayton Act should not be repeated in the construction of the Norris-LaGuardia Act. For us to hold, in the face of this legislation, that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the act and would reverse the declared purpose of Congress."

While Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., supra, does not rule this case, it casts additional doubt upon the applicability of the Sherman Act to cases involving labor disputes such as that here involved, and further weakens the cases referred to in the portion of the opinion above quoted as authority for the rule that a secondary boycott is prohibited by the Sherman Act regardless of the effect of such boycott upon the market.

In United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. ——, the court considered an indictment which charged a union and its officers with restraining interstate commerce by means which involved a secondary boycott or at least a restraint upon the sales in interstate commerce of the product of the Anheuser-Busch Company in the nature of such a boycott. Mr. Justice Roberts, in his dissenting opinion, in which the Chief Justice concurred, said (312 U.S. at page 243, 61 S.Ct. at page 471) :

"Without detailing the allegations of the indictment, it is sufficient to say that they undeniably charge a secondary boycott, affecting interstate commerce."

The attack made by the union upon the sales of the product, which would obviously affect those dealing in the product, is not referred to in the majority opinion as a secondary boycott. It was conceded in that case that the acts complained of in the indictment could not be enjoined because of the restrictions contained in the Norris-LaGuardia Act, and the specific question was whether the activities of the union constituted a violation of the Sherman Act. It was held that they did not. The majority opinion ruled that all of the activities charged in the indictment as violative of the Sherman Act were protected by § 20 of the Clayton Act. The court said (312 U.S. at page 233, 61 S.Ct. at page 467) :

"The refusal of the Carpenters to work for Anheuser-Busch or on construction work being done for it and its adjoining tenant, and the peaceful attempt to get members of other unions similarly to refuse to work, are plainly within the free scope accorded to workers by § 20 for 'terminating any relation of employment', or 'ceasing to perform any work or labor', or 'recommending, advising or persuading others by peaceful means so to do'. The picketing of Anheuser-Busch premises with signs to indicate that Anheuser-Busch was unfair to organized labor, a familiar practice in these situations, comes within the language 'attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working'. Finally, the recommendation to union members and their friends not to buy or use the product

of Anheuser-Busch is explicitly covered by 'ceasing to patronize * * * any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do.' "

It is apparent that the majority of the court thought that what the minority considered a secondary boycott violative of the Sherman Act was permissible conduct under § 20 of the Clayton Act. Mr. Justice Stone, who concurred in the majority opinion, pointed out that the restraints upon interstate commerce charged in the indictment were of two types, one resulting from picketing of the premises of Anheuser-Busch and incidental to the conduct of a local strike which had the effect of closing the plant; and the other resulting from the publication of notices charging Anheuser-Busch with being unfair to labor, and requesting members of the union and the public not to purchase or use the Anheuser-Busch product. Of the first type of restraint, he said (312 U.S. at pages 239–240, 61 S.Ct. at page 470):

"Such restraints, incident to such a strike, upon the interstate transportation of the products or supplies has been repeatedly held by this Court, without a dissenting voice, not to be within the reach of the Sherman Anti-Trust Act."

In speaking of the other type of restraint, he was of the opinion that the indictment did not charge a boycott or strike against any purchaser of Anheuser-Busch beer by any concerted action or refusal to patronize him, such as was condemned in Loewe v. Lawlor, 208 U.S. 274; 294–309, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815, and "that the publication, unaccompanied by violence, of a notice that the employer is unfair to organized labor and requesting the public not to patronize him is an exercise of the right of free speech guaranteed by the First Amendment which cannot be made unlawful by act of Congress." 312 U.S. at page 243, 61 S.Ct. at page 471, 85 L.Ed. ——.

■ The question whether inducing the customers of an interstate trader to refrain from patronizing him by falsely, but peaceably, representing to them that his employees are forced to work long hours, for low wages, and under poor working conditions, and by threats of picketing their stores if they persist in buying his products, can still constitute a violation of the Sherman Act which may be enjoined has perhaps not yet satisfactorily been put at rest. However, our analysis of the opinion in the Apex case leads us to the same conclusion as was reached by the Circuit Court of Appeals of the Second Circuit in the Gold case. We think that the decision of the Supreme Court in the Apex case, particularly when construed in the light of later decisions of that court to which we have referred, clearly indicates, and was intended to indicate, that, unless the intent of a union or the necessary effect of its activities in attempting the destruction of the interstate commerce of an employer by a secondary boycott or in any other way, in order to effect the unionization of his employees, is to control the market or to raise prices or to substantially diminish the supply of goods or otherwise to prejudice or injure the consuming public in some substantial way, such activities are not proscribed by the Sherman Act.

■ The plaintiffs and the interveners believe that the court below had jurisdiction under the Sherman Act, that the recent rulings of the Supreme Court are not applicable to their situation, and that the decree is right. The case is of vital importance to them. This Court is of the opinion that the findings of fact of the court below are sustained by substantial evidence and are not clearly erroneous, and that if that court had jurisdiction, the decree, with some modifications, should be affirmed. Under the circumstances, the mandate of this Court will be withheld for ninety days to allow the plaintiffs to petition the Supreme Court for certiorari. If such petition shall be filed, the mandate will be retained until the petition is ruled upon, and, if granted, the mandate will not go down until the final determination by that court of this case.

The decree appealed from is reversed, and the case is remanded with directions to dismiss the complaint for want of jurisdiction.

WOODROUGH, Circuit Judge (concurring).

I concur in the decision to dismiss for want of jurisdiction, but I cannot agree that the findings of fact of the court below are sustained by substantial evidence or that such a decree as has been entered could be sustained if jurisdiction existed.