## PHILADELPHIA RECORD CO. v. MANUFACTURING PHOTO–ENGRAVERS ASS'N OF PHILADELPHIA et al.

### No. 5202.

District Court, E. D. Pennsylvania.

Oct. 30, 1945.

Daniel Lowenthal and Leonard J. Schwartz, both of Philadelphia, Pa., for plaintiff.

C. Russell Phillips and Robert T. Mc-Cracken, both of Philadelphia, Pa., for Philadelphia Photo-Engravers Union No. 7, I.P.E.U. of II.A., and others.

Albert W. Sanson and Walter B. Gibbons, both of Philadelphia, Pa., for Manufacturing Photo-Engravers Ass'n of Philadelphia, and others.

BARD, District Judge.

Plaintiff brought this action to enjoin defendants from continuing an alleged conspiracy violating Section 1 of the Sherman Anti-Trust Act[1] and to obtain a declaratory judgment defining its rights under Section 274d of the Judicial Code as amended, 28 U.S.C.A. § 400. Plaintiff's petition for a restraining order having been denied, it moved for issuance of a temporary injunction. After hearing of testimony and arguments and submission of briefs, the motion for a preliminary injunction is before the Court for determination.

I make the following special

### Findings of Fact.

1. Plaintiff, Philadelphia Record Company, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal office and place of business at Broad and Wood Streets, Philadelphia, Pennsylvania. It is engaged in the business of printing, publishing and distributing a daily and Sunday morning newspaper and, as an adjunct of this business, it has operated a photo-engraving department during the daytime and night-time since 1929.

2. Defendants, Artcraft Photo-Engravers Co., Inc.; Beck Engraving Co., Inc.; Century Engraving Co., Inc.; Chestnut Street Engraving Co.; Enterprise Engraving Co., Inc.; Gatchell & Manning, Inc.; Graphic Arts, Inc.; Keystone Photo-Engraving Co.; Lang Co., Inc.; Lincoln Photo-Engraving Co.; Lotz Photo-Engraving Co.; Philadephia-Weeks Engraving Co.; Photo-Chromotype Engraving Co., Inc.; Phototype Engraving Co., Inc.; Royal Jones Photo-Engraving Co.; William P. Groves, Jr., Stephen A. Murphy, Joseph L. Johnston and Edward A. McGinnis, copartners trading as Aldine Photo-Engraving Co.; Leon J. Eckell and Karl Zartarian, copartners trading as Allied Photo-Engraving Company; and William J. Henderson, Morris S. Lieb, Howard D. Mathues, and Lewis Pollock, copartners trading as Peerless Engraving Company, are corporations or partnerships separately engaged in the business of photo-engraving in Philadelphia, Pa., in direct and active business competition with plaintiff. Hereinafter these defendants will be referred to as defendant competitors.

3. Defendant, Manufacturing Photo-Engravers Association of Philadelphia, is an unincorporated association whose membership is comprised entirely of the defendant competitors named in paragraph 2. Hereinafter this defendant will be referred to as the defendant association. Plaintiff is not a member of this association.

4. Defendant, Philadelphia Photo-Engravers Union No. 7, I.P.E.U. of N.A., is an unincorporated labor organization affiliated with the American Federation of Labor with offices in Philadelphia, Pa. Its membership is composed of photo-engraver craftsmen and apprentices in and about the City of Philadelphia, including all of the photo-engravers employed by plaintiff. Hereinafter this defendant will be referred to as defendant union.

---

[1] Act of July 2, 1890, c. 647, § 1, 26 Stat. 209, as amended August 17, 1937, c. 690, Title VIII, 50 Stat. 693, 15 U.S.C.A. § 1.

5. Defendants Warner D. Curry and Charles J. Kraft are, respectively, the business manager and the president of defendant union.

6. Plaintiff produces about $100,000 of photo-engraving products yearly which are sold in intrastate and interstate commerce to customers in Pennsylvania, New Jersey, Delaware, Maryland and Virginia.

7. Plaintiff employs twenty-seven photo-engravers, five in the daytime and twenty-two during the night. The day employees work, almost exclusively, on commercial work. The night photo-engravers produce newspaper work and, when they are not engaged in the newspaper work, they do commercial work. Plaintiff requires a minimum of twenty-two photo-engravers on the night shift in order to meet its newspaper deadline on pictures and advertising cuts.

8. Defendant union and plaintiff have a contract known as a newspaper contract, which applies to photo-engraver employees doing newspaper work for the plaintiff.

9. Defendant union and plaintiff have a contract covering the commercial work done by plaintiff's photo-engravers during the day. There is no contract covering night commercial work.

10. For many years defendant competitors, the defendant association and defendant union have had a written contract covering their general relationship. On February 2, 1937, these parties executed a supplemental agreement providing, inter alia, *"that future night forces shall be prohibited unless by consent of both parties to the agreement."* (Italics supplied.) These agreements were renewed periodically, the latest renewed supplemental agreement having been executed on March 17, 1944. This last supplemental agreement expired February 28, 1945.

11. Peerless Engraving Company, one of the defendant competitors and a member of defendant association is permitted to engage in night commercial work with the approval of the parties to the supplemental agreement. In addition to commercial work, Peerless does photo-engraving at night for the Daily News, a Philadelphia newspaper.

12. For many years the International Photo-Engravers' Union of North America has pursued a policy of discouraging commercial work in newspaper plants.

13. During 1944 plaintiff asked the union to negotiate a night commercial agreement, but the union would not consent to negotiate due to the provision in the supplemental contract between the union and the association. The union did offer, upon advice of counsel, an agreement which would bind plaintiff to the terms of the union-association contract and would prohibit night commercial work by plaintiff unless the association would consent thereto.

14. On September 6, 1944, a meeting was held at the office of Gilbert J. Kraus, vice-president of plaintiff company. Present were Gilbert J. Kraus, David S. Loeb and Mr. Hutton of the Record, Warner D. Curry of the Union, and Walleston K. James and Albert W. Sanson, Esquire, representing the Association, whose attendance was requested by Curry. The purpose of the meeting was to find a solution which would permit the Union to negotiate the desired contract. The association representatives objected to the proposed negotiation on the ground that plaintiff was charging lower prices which the association representatives declared was unfair competition, and on the ground that there was insufficient work for the members of the association. The parties were unable to agree upon a definition of "commercial work" and the meeting disbanded.

15. On September 14, 1944, the association adopted a resolution as follows: "Resolved: That the Association insist upon compliance of the Supplemental Agreement dated February 2, 1937 made and executed by the Photo-Engravers' Union No. 7 of Philadelphia and Manufacturing Photo-Engravers' Association of Philadelphia, and continued by supplemental agreement each year, which agreement is now in full force and effect." A copy of this resolution was sent to the Union.

16. On July 30, 1945, a strike vote of the union photo-engraver employees of the Record was taken under the provisions of the Smith-Connally Act[2] to determine whether the Record photo-engravers should stop doing commercial work at night. The employees rejected the strike proposal.

[2] War Labor Disputes Act, Act of June 25, 1943, c. 144, § 8, 57 Stat. 167, 50 U.S.C.A. Appendix, § 1508.

17. On September 16, 1945, defendant union ordered the members of the union employed by plaintiff to discontinue all work upon commercial photo-engraving products at night after 12:01 a.m., September 24, 1945. In compliance with this order, the members of defendant union employed by *plaintiff have discontinued* all night work on commercial photo-engraving products since that date.

18. There is no general strike by members of the union but only a refusal to do night commercial work. Commercial photo-engraving continues during the day shift and newspaper photo-engraving is done during the night shift. The cessation of night commercial work is not due to any grievance or dispute between the union and plaintiff as to wages or working conditions. In fact, the parties have never entered into negotiations to determine satisfactory wages and other conditions for night commercial work. At the present time plaintiff is paying its night photo-engravers the standard night commercial rate although it does not comply with "double-time" and "stagger-shift" provisions as found in the night commercial agreement existing between defendant union and Peerless Engraving Company.

19. Defendant union is unable to supply additional photo-engravers who could be employed by plaintiff to do commercial work during the day. Plaintiff cannot transfer any of its twenty-two night workers to day work because on some nights—which cannot be foretold depending on the happening of news events—they are all needed to meet the demands of the newspaper work which is done at night. The plaintiff has been unable to fulfil its commercial work orders since September 24, 1945.

## Discussion.

The facts set forth above are, for the most part, not in dispute. However, the recollections of the witnesses as to what took place at the meeting of September 6, 1944, are not in harmony. Mr. Kraus and Mr. Loeb stated that the representatives of the association objected to the negotiation of a night commercial agreement by the union because the Record was charging lower prices and because there "were enough engraving shops in Phila-

delphia now to handle the volume of business". Mr. Sanson, who represented the association, testified that he could not recall that such statements had been made and that the only purpose of the meeting was to reach a mutually satisfactory definition of "commercial work". Mr. Sanson did not deny that such statements had been made but only said that he could not now recollect them. Mr. Curry, who represented the union at the meeting, testified that the purpose of the meeting was to adjust the difference between the union and the Record as to whether the employees were doing commercial work at night. In answer to a question asking whether he had stated at the meeting that the association objected to the negotiation of a night commercial agreement with the Record and objected to the Record performing any more night work, Mr. Curry stated, "No, I said this, that under our contract that had been in effect with the Manufacturing Photo-Engravers Association for years, *without qualifying how the union feels about night commercial work,* I said this, that we have this contract of long years standing which provides that only certain things could be accomplished by mutual consent, and I as an individual was bound to be a party to that mutual consent." (Italics supplied.) Mr. Curry, like Mr. Sanson, could not recollect whether the Record representatives had asked the representatives of the association if they objected to the Record continuing night commercial work. Although Mr. Curry's answer was equivocal, it tends to substantiate in some degree testimony of Kraus and Loeb as to the attitude of the parties and the tenor of the discussion at the meeting. In view of this fact and the fact that both Curry and Sanson failed to deny the testimony of Kraus and Loeb upon direct questioning, I must accept the testimony of Mr. Kraus and Mr. Loeb.

Plaintiff complains that defendant union, in combination and conspiracy with the nonlabor defendants, acted to destroy plaintiff's commercial photo-engraving business in violation of Section 1 of the Sherman Anti-trust Law[3]. Defendants urge (1) that this court does not have the power to grant an injunction against the union under the provisions of Sections 6 and 20 of the Clayton Act[4] and the Nor-

---

[3] 15 U.S.C.A. § 1.
[4] Act of October 15, 1914, c. 323, §§ 6, 20, 38 Stat. 731, 738, 15 U.S.C.A. § 17, 29 U.S.C.A. § 52.

ris-LaGuardia Act[5] (2) that the action of the union was not in pursuance of a combination or conspiracy among the defendants, and (3) that there has been no unlawful interference with interstate commerce.

■ By the terms of the Sherman Anti-trust Act, the federal courts have power to enjoin "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."[6] It was settled by earlier decisions of the Supreme Court that labor unions came within the scope of the Act when, pursuant to a conspiracy, they unlawfully restrained or impeded the free flow of interstate commerce. Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Coronado Coal Co. v. United Mine Workers of America, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403. Despite the provisions of Sections 6 and 20 of the Clayton Act[7] which declared that labor was neither a commodity nor an article of commerce and limited the power of the courts to issue injunctions in a case involving, or growing out of, a labor dispute over terms or conditions of employment, the Supreme Court declined to exempt labor unions entirely from the provisions of the Sherman Act. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n of North America, 274 U.S. 37, 47 S.Ct. 522, 71 L. Ed. 916, 54 A.L.R. 791. In an effort to nullify the effect of the Duplex and Bedford cases, the Congress adopted the Norris-LaGuardia Act[8] which broadened the judicial definition of "labor disputes" heretofore in effect and further restricted the use of injunctions against labor unions. United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, held that the two congressional policies, one seeking to preserve competitive business and the other attempting to preserve the rights of labor to organize and bargain, as evidenced by the Sherman, Clayton and Norris-LaGuardia Acts, must be considered together and reconciled to determine to what extent the Congress intended the Clayton and Norris-LaGuardia Acts, which protected labor activities, to modify and limit the purposes and application of the Sherman Anti-trust Act.

The most recent decision of the Supreme Court to resolve this conflict is Allen Bradley Co. v. Local Union No. 3, I. B. of E. W., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. ——, filed June 18, 1945. In that case the union obtained closed shop agreements with most of the local electrical contractors and manufacturers of electrical equipment in the New York area by the use of strikes and boycotts. In an effort to create more jobs for its members, the union stipulated in the agreements that the contractors were obligated to purchase supplies from local manufacturers having agreements with the union, and the manufacturers agreed to limit their New York area sales to electrical contractors who were unionized. This union-manufacturer-contractor relationship was gradually expanded to control prices and marketing, in addition to conditions of employment. The effect of this multilateral market control was to suppress entirely the movement of electrical supplies into the metropolitan area and to permit the equipment manufacturers and the contractors to raise prices. An action was brought by manufacturers of electrical equipment situated outside the New York area to enjoin the continuation of the arrangement between the union, contractors and manufacturers. There was an obvious restraint of interstate commerce and the creation of a local monopoly and the question presented for decision by the Supreme Court was whether [325 U.S. 801, 65 S.Ct. 1536] "labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet business men to do the precise things which that Act prohibits." The Court opined that "Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services." Further, that although Section 6 of the Clayton Act declares that the Sherman Act shall not be construed to prohibit the operation of labor unions "instituted for the purposes of mutual help", this provision "can hardly be thought to

---

5 Act of March 23, 1932, c. 90, § 1, 47 Stat. 70, 29 U.S.C.A. § 101 et seq.
6 15 U.S.C.A. §§ 1, 4.

7 15 U.S.C.A. § 17, 29 U.S.C.A. § 52.
8 29 U.S.C.A. § 101 et seq.

cover activities for the purpose of 'employer-help' in controlling markets and prices." The Court recognized the possibility that if the union had attempted to achieve the same results by itself, it might be immune from the prohibitions of the Sherman Act if it had limited the means to those union activities exempted by the Clayton Act. The Court thus held that labor unions who aid and abet business men to violate the Sherman Act are subject to judicial restraint, notwithstanding the Clayton and Norris-LaGuardia Acts. See also United States v. Brims, supra.

■ Under the Allen Bradley opinion, therefore, if plaintiff has established that the union combined with the defendant association to do anything prohibited by the Sherman Act, it is entitled to an injunction against the union and the association restraining them from such prohibited activity despite the provisions of the Clayton and Norris-LaGuardia Acts. See also Truck Drivers' Local No. 421, I.B. of T.C.W. and H. of A. v. United States, 8 Cir., 128 F.2d 227.

### The Combination.

It seems to me that the evidence sustains a finding that the union combined with, or aided and abetted, the defendant association, at least to prevent the Record from producing commercial photo-engraving products at night. The relationship between the union and the Record has been harmonious for many years. It is true that it has been the policy of the international union, the parent organization, to discourage, for various legitimate reasons, commercial photo-engraving by newspapers. However, since 1929 the local union made only desultory attempts to put an end to the commercial work of plaintiff. In fact, the union negotiated a contract with plaintiff covering day commercial work. In 1937 the union and defendant association entered into a supplemental agreement providing that "future night forces shall be prohibited unless by consent of both parties to the agreement." Plaintiff, interested in obtaining a union contract covering night commercial work, asked the union to negotiate such a contract in 1944, without proposing possible terms or conditions. The union, bound by its agreement with the association, would not consent to negotiate, although it did offer the Record a contract which would bind it to the terms of the supplemental

agreement and would, in effect, preclude further night commercial work. In an effort to solve this impasse, plaintiff met with representatives of the union and defendant association. The association representatives objected to the negotiation and the meeting disbanded when the parties were unable to agree upon a definition of "commercial work". Shortly thereafter the association adopted a resolution calling for compliance with the supplemental agreement and sent a copy of this resolution to the union. The union and defendant association permitted the supplemental agreement to expire on February 28, 1945. On July 30, 1945, plaintiff's employees who are members of the photo-engravers union voted against cessation of night commercial work. Despite this vote, the union instructed its members to stop all night commercial work on September 24, 1945, and no night commercial work has been produced by plaintiff since that date.

Throughout the course of events leading up to the work stoppage there runs the thread of a common design by the union and defendant association to put an end to night commercial work by the Record. Plaintiff infers that the union policy was controlled, at least to some extent, by its agreement with the association. Curry, the business manager of the union, testified that *"without qualifying how the union feels about night commercial work"* (italics supplied), he felt bound by the provisions of the union-association agreement calling for mutual consent of the parties. Further, there was evidence that, despite the lapse of the supplemental agreement, the union was influenced by the agreement throughout the subsequent events. Sprigman, the union secretary, answered in the affirmative to a question asking whether the supplemental agreement was still effective at the time of the hearing. Although this testimony is not conclusive, and might not be binding upon the union, it effectively indicates the attitude of one of the key members of the union.

Defendants urge that the lapse of the union-association supplemental agreement on February 28, 1945, negatives the existence of a combination at this time. The evidence discloses, however, that the parties continued to act pursuant to the provisions of the supplemental agreement, and I do not think the failure to renew

the agreement in a formal manner altered their relationship.

The Applicability of the Sherman Act.

There remains for decision the question whether this combination had for its purpose or resulted in an interference with interstate commerce within the meaning of the Sherman Anti-trust Act.

The union has not attempted to stop all commercial photo-engraving by the Record. The "stop-work" order was directed only to the night photo-engraving force. The union does not object to the production of commercial photo-engraving products by plaintiff during the day. Therefore, if plaintiff is able to maintain an adequate day crew either by transferring some of the men to day work or by employing additional photo-engravers, there would not be any reduction in the production of commercial photo-engravings. However, plaintiff maintains and has proved that in order to meet the dead-line on the various editions of its newspaper it cannot transfer any night employee to day work. Also, it has requested the union to furnish additional photo-engravers, but all of the union's members in this area are employed so that the union is unable to fulfill the request. Plaintiff argues that the net effect of the cessation of night commercial work is to reduce materially its volume of commercial photo-engraving, that much of these products were sold to customers in neighboring states, and that the union, in combination and conspiracy with the association, has thus restrained interstate commerce within the meaning of the Sherman Act.

The precise question to be determined is whether the combination between the union and the association to prohibit night photo-engraving work by plaintiff which, because of the status of the local labor supply, materially reduces the volume of photo-engraving produced by plaintiff, is a conspiracy to restrain interstate commerce under the Sherman Act because the defendants knew or should have known that these engravings, if produced, would be shipped in interstate commerce.

The evidence sustains plaintiff's contention that the effect of the work stoppage, coupled with the status of the local labor supply, reduced the volume of commercial engravings produced and lowered the volume of interstate shipments. These acts of the defendants affected interstate commerce. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352.

However, the Sherman Act does not prohibit all combinations or conspiracies which affect or impede interstate commerce. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L. Ed. 825; United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762. (First Coronado case). In the First Coronado case the local union, in an effort to unionize a coal mine, forcibly stopped the production of coal. All production and shipment of coal moving in interstate commerce were ended, and, in addition, the strikers destroyed some railroad cars loaded with coal and billed for interstate shipment. Although it admitted that the strike substantially affected interstate commerce, the Supreme Court held that the union had not restrained interstate commerce within the meaning of the Sherman Act on the ground that obstruction to coal mining is not a direct obstruction to interstate commerce in coal and "though it may prevent coal from going into interstate commerce, [it] is not a restraint of that commerce, unless the obstruction to mining is intended to restrain commerce in it, or has necessarily such a direct, material, and substantial effect to restrain it that the intent reasonably must be inferred," 259 U.S. 344, 411, 42 S.Ct. 570, 583, 66 L.Ed. 975, 27 A.L.R. 762. In the Second Coronado case, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963, upon retrial of the case on amended pleading, the Court sustained a judgment for treble damages against the union after finding that there was direct evidence of an intent and purpose on the part of the union to restrain interstate commerce by preventing the shipment to other states of non-union coal.

In United Leather Workers, etc. v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566, the Supreme Court held that a strike preventing the manufacture of goods does not restrain interstate commerce within the scope of the Sherman Act, even though the strikers knew that the goods were to be shipped in interstate commerce, provided there is no actual interference

with the transportation or sale of the goods to customers in other states. The Court stated the law as follows, 265 U.S. at page 471, 44 S.Ct. at page 627, 68 L. Ed. 1104, 33 A.L.R. 566: "* * * that the mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture is ordinarily an indirect and remote obstruction to that commerce. It is only when the intent or necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize its supply, or control its price, or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce."

The leading recent expression by the Supreme Court on this question is found in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. There the union declared a sit-down strike, occupied the company's factory, considerably damaged the machinery, and refused to permit the company to ship in interstate commerce manufactured goods stored on the premises. This case involved two types of restraint, a restraint upon production and a restraint upon the shipment and delivery of goods in interstate commerce. In a comprehensive opinion the Supreme Court reviewed their prior applications of the Sherman Act in labor cases and framed the law which is applicable in the instant case.

The Circuit Court of Appeals for the Second Circuit, in United States v. Gold, 115 F.2d 236, was called upon to construe the decision in the Apex case and a quotation from the Gold case provides an exemplary exposition of the tests evolved by the·Supreme Court. Judge Learned Hand, delivering the opinion of the Court, said, 115 F.2d at pages 237 and 238:

"The case was tried before the decision of the Supreme Court in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, before which it had been quite commonly supposed that the Sherman Act covered, not only concerted action intended to control prices or supply, or resulting in such control, but generally all action which so far affected interstate commerce as to be within the constitutional power of Congress at all; that is, that Congress in the Sherman Act had meant to exercise its power as broadly as possible. This view the court repudiated in the Apex case. Its reasoning was that the act had been passed only to implement the common law as to restraints of trade; and that, although it imposed its own liabilities, civil and criminal, besides providing remedies for their breach, nevertheless it took the common law as its model, creating federal rights and duties fashioned after existing precedents. So much the court had often said before, and the new contribution was that, turning to those precedents, it now held that the only restraints forbidden were those which limited competition in 'business and commercial transactions,' and which 'tended to restrict production, raise prices or otherwise control the market *to the detriment of purchasers or consumers of goods and services,'* 310 U.S. at page 493, 60 S.Ct. at page 992, 84 L.Ed. 1311, 128 A.L.R. 1044. These were no chance words; they were the burden of the reasoning by which the court affirmed a reversal by the Circuit Court of Appeals. For example, the contracts must be 'for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, *which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market,'* 310 U.S. at page 497, 60 S.Ct. at page 994, 84 L.Ed. 1311, 128 A.L.R. 1044. Again, 'restraints upon competition have been condemned only *when their purpose or effect was to raise or fix the market price.'* 310 U.S. at page 500, 60 S.Ct. at page 996, 84 L.Ed. 1311, 128 A.L.R. 1044. See, also, 310 U.S. at pages 501, 507, 512, 60 S.Ct. 996, 999, 1002, 84 L.Ed. 1311, 128 A.L.R. 1044. Mere restraints upon transportation of goods across state lines were therefore not enough; they must be in execution of a plan to restrict market competition, or that must be their necessary result. Furthermore, the argument was necessary to the decision because not only had the 'sit-down' strikers entirely stopped the manufacture of goods, 80 per cent of which would have gone into interstate commerce; but their leader expressly refused to allow any finished goods—of which there was a large amount on hand—to leave the factory. It was a complete answer to these wrongs—which the court condemned .without stint—that

*the plaintiff had not shown that the strike had had any substantial commercial effect upon either the prices at which the goods were sold or the supply upon the market, and that they had not prejudiced consumers in any other way."* (Italics in the quotation supplied.) See also International Ladies' Garment Workers' Union v. Donnelly Garment Co., 8 Cir., 119 F.2d 892.

In concluding the opinion of the Court in the Apex case, Mr. Justice, now Chief Justice, Stone states, 310 U.S. at page 512, 60 S.Ct. at page 1002, 84 L.Ed. 1311, 128 A.L.R. 1044:

"These cases show that activities of labor organizations not immunized by the Clayton Act are not necessarily violations of the Sherman Act. Underlying and implicit in all of them is recognition that the Sherman Act was not enacted to police interstate transportation, or to afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to 'monopolize the supply, control its price, or discriminate between its would-be purchasers.' These elements of restraint of trade, found to be present in the Second Coronado case and alone to distinguish it from the First Coronado case and the Leather Workers case, are wholly lacking here. We do not hold that conspiracies to obstruct or prevent transportation in interstate commerce can in no circumstances be violations of the Sherman Act. Apart from the Clayton Act it makes no distinction between labor and non-labor cases. We only hold now, as we have previously held both in labor and non-labor cases, that such restraints are not within the Sherman Act unless they are intended to have, or in fact have, the effects on the market on which the Court relied to establish violation in the Second Coronado case. Unless the principle of these cases is now to be discarded, an impartial application of the Sherman Act to the activities of industry and labor alike would seem to require that the Act be held inapplicable to the activities of respondents which had an even less substantial effect on the competitive con-

ditions in the industry than the combination of producers upheld in the Appalachian Coals case and in others on which it relied."

█ The law, as stated in the Apex case with regard to the tests to be applied in determining whether acts affecting interstate commerce come within the purview of the Sherman Act, is controlling here. As I have previously stated, the evidence shows a combination between the union and the association to end further commercial photo-engraving by plaintiff at night. Plaintiff presented no direct evidence of any intent by defendants to restrain interstate commerce. However, the effect of defendants' acts, coupled with the inability of plaintiff to expand its day force, is to reduce the production of goods which, if produced, would be shipped in interstate commerce.[9] Without more, plaintiff has failed to prove a violation of the Sherman Act under the doctrine of the Apex case since the mere reduction in the production of goods is only an indirect obstruction of interstate commerce. United Leather Workers, etc. v. Herkert & Meisel Trunk Co., supra. The evidence adduced as to the present application of the supplemental agreement does not show such restraint upon competition which has "or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition * * *." 310 U.S. 469, 501, 60 S.Ct. 982, 986, 84 L. Ed. 1311, 128 A.L.R. 1044. There is no evidence that the association, in concert with the union, is attempting to fix or raise prices. Nor is there any evidence that cessation of night production of photo-engravings by the plaintiff has "had any substantial commercial effect upon either the prices at which the goods [are] sold or the supply upon the market." United States v. Gold, 2 Cir., 115 F.2d 236, 237. There is a total lack of evidence showing that the joint action of the union and the association prejudiced the consumers in any way.

█ This being so, the evidence does not show an interference with interstate commerce in violation of the Sherman

---

9 It should be noted that plaintiff's inability to obtain skilled photo-engravers is an essential link in its argument that defendants have unlawfully violated the

Sherman Act. Without this, plaintiff could maintain full production of engravings to be shipped to other states during the day, albeit at a higher labor cost.

Act within the rules set forth in the Apex case. Plaintiff's motion for a temporary injunction must therefore be denied.

Under principles of fair play, I would be inclined to grant the injunction requested. It seems to me that the union is discriminating against the Record when it permits Peerless Engraving Company, a member of the association, to engage in night commercial work in conjunction with the photo-engraving it does for another newspaper, but refuses even to attempt to negotiate a similar contract with the Record. It is true that the union points to the long standing opposition by its parent organization to commercial work by newspapers. But this has little force and is unconvincing in view of the fact that the local union permits plaintiff to do commercial photo-engraving during the day.

Plaintiff seeks nothing more than what the union and the association have granted to Peerless[10]. It already pays the standard hourly rates for night commercial work, except the "double-time" and "stagger-shift" provisions found in the Union-Peerless agreement, and would like the union to attempt to negotiate a contract with mutually satisfactory terms. It cannot be denied that plaintiff appears to have common sense reasons for complaint even if it has no legal reasons entitling it to relief from this Court. It seeks to engage in a lawful business in a lawful and legitimate way. Under present circumstances, it is practically prohibited from so doing by defendants' acts.

However, the law will not compel the union to do business in a way not of its choice, so long as its choice is lawful, merely to permit plaintiff to do business in the manner it chooses. Plaintiff may be injured and be the victim of discrimination but, under the evidence presented, it has no remedy in this Court under the Sherman Act.

The petition for a preliminary injunction is denied.

### Conclusions of Law.

1. This court has jurisdiction to hear this action under the provisions of Section 24(8) of the Judicial Code[11].

2. This court has jurisdiction over the defendants.

3. A combination and agreement exists between defendant union, defendant association, and defendant competitors (1) to enforce the supplementary agreement between defendant union and defendant association, which restricts future night commercial photo-engraving in Philadelphia without the consent of both parties, against the plaintiff, and (2) to compel the plaintiff to cease production of commercial photo-engraving products at night.

4. Plaintiff has not sustained the burden of proving that the purpose or actual or probable result of this combination and agreement is an unlawful restraint of interstate commerce within the meaning of the Sherman Anti-trust Act.

5. Plaintiff's motion for a preliminary injunction is denied.

---

[10] At the conclusion of testimony, counsel for the defendant association said the association would have no objection if the Record were given a contract to do night work the same as Peerless. It would appear then that the only obstacle now preventing the Record from obtaining a night contract would be the opposition of the union. I do not think this change of attitude of the association renders the union immune from the law of the Allen Bradley case.

[11] Act of March 3, 1911, c. 231, § 24, par. 8, 36 Stat. 1092, as amended October 22, 1913, c. 32, 38 Stat. 219, 28 U.S.C.A. § 41(8).